JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CVS PHARMACY, INC.

**(b)** County of Residence of First Listed Plaintiff   Providence, RI
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Douglas F. Johnson, Earp Cohn P.C. 123 S. Broad Street, Suite 1030, Philadelphia, PA 19109 (215) 963-9520

## DEFENDANTS

ACTAVIS ELIZABETH, LLC, et al.

County of Residence of First Listed Defendant   Morris, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Sheron Korpus, Kasowitz Benson Torres LLP, 1633 Broadway, New York, NY 10019

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [X] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[X] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br>**SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609<br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | [ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 1

Brief description of cause:
Defendants conspired not to compete on the manufacture, pricing, and sale of numerous generic drugs in the United States.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$2.5 Billion +

CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE   Cynthia M. Rufe
DOCKET NUMBER   2:16-md-02724-CMR

DATE   12/15/2020
SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____CVS Pharmacy, Inc., One CVS Drive, Woonsocket, Rhode Island 02895_____

Address of Defendant: _____Actavis Elizabeth LLC, 400 Interpace Parkway, Parsippany, NJ 07054_____

Place of Accident, Incident or Transaction: _____Multiple locations throughout the United States_____

---

**RELATED CASE, IF ANY:**

Case Number: _____2:16-md-2724_____   Judge: _____Honorable Cynthia M. Rufe_____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☑   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☑

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____12/15/2020_____        _____Attorney-at-Law / Pro Se Plaintiff_____        _____40036_____
                                                                                    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☑ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
       *(Please specify): _____*

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify): _____*
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
       *(Please specify): _____*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____Douglas F. Johnson_____, counsel of record *or pro se plaintiff*, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _____12/15/2020_____        _____Attorney-at-Law / Pro Se Plaintiff_____        _____40036_____
                                                                                    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| CVS Pharmacy, Inc. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Actavis Elizabeth, LLC, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( X )

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )

| | | |
|---|---|---|
| December 15, 2020 | | Plaintiff CVS Pharmacy, Inc. |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-963-9520 | 215-963-9620 | dfjohnson@earpcohn.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | Civil Action No.: _____ |
| | MDL 2724 |
| CVS PHARMACY, INC., | COMPLAINT |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | |
| ACTAVIS ELIZABETH, LLC; ACTAVIS HOLDCO U.S., INC.; ACTAVIS PHARMA, INC.; ALVOGEN INC.; AMNEAL PHARMACEUTICALS, INC.;  AMNEAL PHARMACEUTICALS, LLC; AMNEAL PHARMACEUTICALS OF NEW YORK, LLC; APOTEX CORP.; ASCEND LABORATORIES, LLC; AUROBINDO PHARMA USA, INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; BRECKENRIDGE PHARMACEUTICAL, INC.;  CAMBER PHARMACEUTICALS, INC.; CITRON PHARMA, LLC;  DAVA PHARMACEUTICALS, LLC; DR. REDDY'S LABORATORIES, INC.; EMCURE PHARMACEUTICALS, LTD.; ENDO HEALTH SOLUTIONS, INC.; ENDO INTERNATIONAL PLC; ENDO PHARMACEUTICALS, INC.; EPIC PHARMA, LLC; FOUGERA PHARMACEUTICALS, INC.; GENERICS BIDCO I, LLC; GLENMARK PHARMACEUTICALS INC., USA; GREENSTONE LLC; G&W LABORATORIES, INC.; HERITAGE PHARMACEUTICALS, INC.; HIKMA PHARMACEUTICALS USA INC.; HIKMA LABS, INC.; IMPAX LABORATORIES, LLC; JUBILANT CADISTA PHARMACEUTICALS INC.; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MAYNE PHARMA, INC.; MAYNE PHARMA USA, INC.; MORTON GROVE PHARMACEUTICALS, INC.; MYLAN INC.;  MYLAN INSTITUTIONAL INC.; MYLAN | |

PHARMACEUTICALS, INC.; MYLAN N.V.;
OCEANSIDE PHARMACEUTICALS, INC.; PAR
PHARMACEUTICAL COMPANIES, INC.; PAR
PHARMACEUTICAL, INC.; PERRIGO NEW
YORK, INC.;  PERRIGO COMPANY, PLC;
PFIZER INC.; SANDOZ, INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.;  TARO
PHARMACEUTICAL INDUSTRIES LTD.;
TELIGENT, INC.; TEVA PHARMACEUTICALS
USA, INC.; TORRENT PHARMA INC.;  UPSHER-
SMITH LABORATORIES, LLC; VIATRIS INC.;
WEST-WARD COLUMBUS, INC.;
WOCKHARDT USA LLC; ZYDUS
PHARMACEUTICALS (USA) INC.

        Defendants.

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................2

JURISDICTION AND VENUE .........................................................................8

PARTIES ...........................................................................................................11

    Plaintiffs............................................................................................... 11

    Defendants ............................................................................................ 12

    Co-Conspirators ................................................................................... 28

INTERSTATE TRADE AND COMMERCE ....................................................31

FACTUAL ALLEGATIONS ...........................................................................32

    I.     Generic Drugs and Generic Competition........................................... 32

          A.   The Hatch-Waxman Act ........................................................ 32

          B.   Relevant Entities in the Drug Distribution System...................... 34

          C.   Generic Drug Pricing ............................................................ 35

    II.    Defendants' Overarching Conspiracy to Allocate Drug Business and Increase Generic Drug Prices.................................................... 37

          A.   Defendants had the Incentive to Conspire .................................... 37

          B.   The Generic Drug Business is Conducive to Conspiracy ............. 38

          C.   The Contours and Operation of the Overarching Conspiracy ....... 41

          D.   Defendants Had Ample Opportunity to Conspire........................ 53

          E.   Evidence That Defendants took Actions against their Self-Interest ............ 65

          F.   Federal and State Antitrust Enforcers Have Commenced Legal Proceedings Over the Conspiracy.................................................. 66

          G.   Defendants' Conspiracy was Effective And is Still Ongoing...................... 75

ANTITRUST INJURY ......................................................................................76

TOLLING OF THE STATUTE OF LIMITATIONS/FRAUDULENT CONCEALMENT
THE STATUTES OF LIMITATIONS DO NOT BAR CVS's CLAIMS ...................77

i

I.      Tolling Due to the Filing of Applicable Class Action Complaints
        (*American Pipe Tolling*) ....................................................................... 77

II.     Government Criminal Investigations—15 U.S.C. § 16(i). .................................. 77

III.    Fraudulent Concealment Tolled the Statutes of Limitations ............................... 78

        A.    Defendants Took Active Measures to Conceal the Overarching
              Conspiracy ...................................................................................... 78

DEFENDANTS ENGAGED IN OBSTRUCTION OF JUSTICE ............................................... 83

CONTINUING VIOLATIONS .................................................................................................... 87

CLAIM FOR RELIEF—SHERMAN ACT § 1 (OVERARCHING CONSPIRACY)................. 88

CLAIM FOR RELIEF—SHERMAN ACT § 1 (EACH PRICE-FIXED DRUG) ...................... 89

PRAYER FOR RELIEF ............................................................................................................... 90

JURY DEMAND .......................................................................................................................... 91

Appendix A: List of Price-Fixed Drugs ..................................................................................... A-1

Appendix B: Teva's Role in Conspiracies Related to Price-Fixed Drugs .................................. B-1

Appendix C: Sandoz's Role in Conspiracies Related to Price-Fixed Drugs .............................. C-1

Appendix D: Heritage's Role in Conspiracies Related to Price-Fixed Drugs ........................... D-1

Appendix E: Taro's Role in Conspiracies Related to Price-Fixed Drugs ................................... E-1

Appendix F: Mylan's Role in Conspiracies Related to Price-Fixed Drugs ............................... F-1

Appendix G: Perrigo's Role in Conspiracies Related to Price-Fixed Drugs ............................. G-1

Appendix H: G&W's Role in Conspiracies Related to Price-Fixed Drugs ............................... H-1

Appendix I: Trade Association Meeting Attendance ................................................................... I-1

Plaintiff CVS Pharmacy, Inc. ("CVS"), through its attorneys, hereby brings this action

against Defendants Actavis Elizabeth, LLC; Actavis Holdco U.S., Inc.; Actavis Pharma, Inc.,

Alvogen Inc.; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals, LLC; Amneal

Pharmaceuticals of New York, LLC; Apotex Corp.; Ascend Laboratories, LLC; Aurobindo

Pharma USA, Inc.; Bausch Health Americas, Inc.; Bausch Health US, LLC; Breckenridge

Pharmaceutical, Inc.; Camber Pharmaceuticals, Inc.; Citron Pharma, LLC;  DAVA

Pharmaceuticals, LLC; Dr. Reddy's Laboratories, Inc.; Emcure Pharmaceuticals, Ltd.; Endo

Health Solutions, Inc.; Endo International plc; Endo Pharmaceuticals, Inc.; Epic Pharma, LLC;

Fougera Pharmaceuticals, Inc.; Generics Bidco I, LLC; Glenmark Pharmaceuticals Inc., USA;

Greenstone LLC; G&W Laboratories, Inc.; Heritage Pharmaceuticals, Inc.; Hikma

Pharmaceuticals USA Inc.; Hikma Labs, Inc.; Impax Laboratories, LLC; Jubilant Cadista

Pharmaceuticals Inc.; Lanett Company, Inc.; Lupin Pharmaceuticals, Inc.; Mayne Pharma, Inc.;

Mayne Pharma USA, Inc.; Morton Grove Pharmaceuticals, Inc.; Mylan Inc.; Mylan Institutional

Inc.;  Mylan Pharmaceuticals, Inc.; Mylan N.V.; Oceanside Pharmaceuticals, Inc.; Par

Pharmaceutical Companies, Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Perrigo

Company, plc; Pfizer Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro

Pharmaceuticals USA, Inc.; Taro Pharmaceuticals Industries Ltd.; Teligent, Inc.; Teva

Pharmaceuticals USA, Inc.; Torrent Pharma Inc.; Upsher-Smith Laboratories, LLC; Viatris Inc.;

West-Ward Columbus, Inc.; Wockhardt USA LLC; and Zydus Pharmaceuticals (USA) Inc.

Specifically, CVS hereby alleges —upon knowledge with respect to its own acts and those it

witnessed first-hand, and upon information and belief with respect to all other matters—the

following against Defendants:

## NATURE OF THE ACTION

1.      In 1984, Congress enacted legislation aimed at expediting the approval of generic drugs by the U.S. Food and Drug Administration ("FDA").  That law, entitled the Drug Price Competition and Patent Term Restoration Act and commonly known as the "Hatch-Waxman Act" was passed to provide pharmaceutical companies with the opportunity to offer bioequivalent versions of branded drugs that safely and effectively treat all Americans at substantially lower prices.[1]

2.      Since the enactment of the Hatch-Waxman Act, numerous manufacturers of various generic drugs entered the U.S. and the manufacturing and distribution of generic drugs in the U.S. has proliferated.  As a result of this entry, unfettered competition amongst these generic manufacturers was unleashed and, in turn, the prices that they have charged for their generic products was constrained by actual and potential alternative generic drug suppliers.  This competitive dynamic functioned well for decades, reducing total U.S. pharmaceutical costs by, in the very least, tens of billions of dollars annually.

3.      This case, like others filed in this multi-district litigation, concerns an Overarching Conspiracy conceived, implemented and enforced by Defendant generic drug manufacturers to suppress the very competition that the Hatch-Waxman Act sought to spur.  That Overarching Conspiracy is an agreed upon code that was conceived of and implemented by the Defendants to quash the constraining impact that unfettered competition had on the prices that they were able to charge for the generic drugs that they supplied.  The common goal of this conspiracy, which began as early as 2009, was and continues to be to artificially raise the prices

---

[1]  *See* Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note 355, 360cc, 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282.

of generic drugs sold by the Defendants to supra-competitive levels.  Embedded within this Overarching Conspiracy were specific agreements to allocate the sales, and, in turn, raise the prices of, at least, approximately 400 particular generic drugs (referred to herein as the "Price-Fixed Drugs").

4.      This particular case concerns the impact of the Overarching Conspiracy and the conspiracies related to the Price-Fixed Drugs on Plaintiff CVS, one of leading providers of retail, mail-order and long-term care facility pharmacy services in the U.S.  CVS was a prime victim of these conspiracies, paying, as a result of Defendants' anticompetitive conduct, billions of dollars of overcharges for the Price-Fixed Drugs.  A detailed list of the Price-Fixed Drugs are identified in Appendix A.

5.      There can be no doubt that the Overarching Conspiracy, as well as the particular conspiratorial actions taken by Defendants to raise the prices of the Price-Fixed Drugs, has been wildly successful.  It has enabled the Defendants to impose many billions of dollars of anticompetitive overcharges not only on CVS, but on direct purchasers across the U.S., increasing the cost of health care throughout the country.  These actions have violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1 *per se*.

6.      Defendants effectuated the Overarching Conspiracy through a variety of anticompetitive tactics, including agreements to (1) allocate particular customers that purchased generic drugs to particular Defendants, and (2) fix the prices of particular generic drugs so they would not fall below certain floors.  Specifically, the Overarching Conspiracy involved allocating a "fair share" of generic drug sales to each of the Defendants.  Pursuant to this conspiracy, certain Defendants, dubbed by other Defendants as "high quality" or "responsible" competitors, agreed to refrain from actually or effectively competing to make the sale of

3

particular generic drugs to particular purchasers (*i.e.*, Drugs A and B) so that other Defendants could supply these drugs at artificially high prices without fear of losing business.  In consideration for this allocation, the Defendants that were artificially shielded from price competition on the sale of Drugs A and B would agree not to compete for the sale of other generic drugs (*i.e.*, Drugs C and D) to other purchasers so that the suppliers of Drugs C and D could likewise impose supra-competitive prices.  Accordingly, the overarching "fair share" agreement central to this case, in addition to the specific "fair share" agreements that were subsumed within it, has constituted an "I'll scratch your back if you scratch my back" construct. Importantly, the agreement among all Defendants to adhere to the rules regarding "fair share" was critical to their ability to maintain high prices.

7.     The Overarching Conspiracy has also involved agreements to charge higher prices than would have prevailed in a competitive market for the Price-Fixed Drugs.  In addition to allocating "fair shares" of particular generic drug sales to Defendants, the Defendants agreed not to lower prices below certain floors to ensure that inadvertent potential or actual competition would not break out amongst them.  In this way and to further effectuate the conspiracy, Defendants routinely provided their co-conspirators with information on price increases that they intended to take in advance.  They did this to ensure that all of the various conspirators would follow suit with matching or even greater price increases.

8.     Each of the Defendants had the incentive to participate in the Overarching Conspiracy as well as the conspiracies related to the Price-Fixed Drugs that were subsumed within it.  By participating, they were able to artificially raise the prices of the generic drugs that they sold and, in turn, substantially increase their profitability.

9.      Each of the Defendants also had an opportunity to conspire and, indeed, did so. An interwoven, cooperative culture has permeated throughout the generic drug industry in the U.S.  Employees, particularly Account Managers, at the Defendants frequently moved from the employ of one Defendant to another while maintaining their relationships at their prior Defendant employer.  These employees then, as a matter of course, repeatedly engaged in inter-firm communications with their prior colleagues at their former firms, in addition to other employees of Defendants, by telephone, text, email or other electronic means -- as numerous records demonstrate -- shortly, if not immediately, before price increases on various generic drugs were announced.

10.     These employees also had the opportunity to conspire, and, indeed, did conspire, at various industry events.  They repeatedly discussed how to effectuate the Overarching Conspiracy and the individual conspiracies related to the Price-Fixed Drugs at industry conferences, social gatherings, "industry dinners," "girls' nights out," lunches, golf outings, and meetings of the trade associations that they attended.  This evidence demonstrates not only an ability among the Defendants to conspire, but that these conspiracies were, in fact, launched and implemented.

11.     The Defendants also had the ability to implement and enforce the Overarching Conspiracy and those that were subsumed within it.  In general, there are only a few suppliers of each generic drug, which, by definition, is a commodity-like product, making generic drug markets, including those relevant to the Price-Fixed Drugs, particularly susceptible to cartelization.  This, in other words, made it easier to divide individual generic drug markets among competitors.

12.     The generic drug price increases covered by this Complaint cannot be explained by changes in supply, the costs of production, or demand.  There are no market forces that explain the pricing of the drugs identified in this Complaint other than collusion.  CVS, for example, often facing inexplicable price increases on generic drugs that were not justified by any legitimate rationales, including, but not limited to, supply chain problems.

13.     To be sure, the repeated actions taken by the Defendants to forego increasing their market shares in order to preserve "fair share" principles are actions that, in a competitive market, would not have been taken.  CVS, for example and notwithstanding its significant position as a direct purchaser of generic drugs, was often confronted with generic drug suppliers that merely passed on the opportunity to make substantial sales to it without a justifiable or any other explanation.  The fact that Defendants often passed on the opportunity to do business with CVS, given its leading position amongst pharmacies, shows that they were willing to take actions that were against their individual self-interests to assure the continued viability of the subject conspiracies.  This further demonstrates that Defendants' pricing and supply decisions were motivated by an illegal conspiracy rather than their own unilateral incentives.

14.     Further demonstrating that Defendants participated in these conspiracies is the fact that the Defendants actively took measures to conceal their actions from CVS and other purchasers of generic drugs throughout the damages period.  The Defendants were aware that their conspiratorial conduct violated law and, for this reason, they actively cloaked their actions from their customers (and government enforcers).

15.     The subject Overarching Conspiracy and the conspiracies to allocate the sale of specific generic drugs amongst Defendants and to fix, maintain, and stabilize their price has been and continues to be the subject of substantial criminal proceedings brought by the Antitrust

Division of the US Department of Justice ("DOJ") and civil complaints filed by 48 State

Attorneys General ("State AGs") and private parties.  These various proceedings substantiate the

claims made herein.

16.     While there were many participants in these conspiracies, the evidence

demonstrates that there were several ringleaders.  Among those are Defendants Teva, Sandoz,

Heritage, Taro, Mylan, Perrigo, and G&W.  Specific details regarding their central roles in the

Overarching Conspiracy and particular conspiracies related to the Price-Fixed Drugs can be

found in the various Appendices to this Complaint.[2]

17.     As a result of Defendants' conspiracy, CVS substantially overpaid for each of the

Price-Fixed Drugs.  In particular, it paid a 100% increase or more on hundreds of generic drugs

during the damages period – an increase that has been labelled by the U.S. Government

Accountability Office as "extraordinary" and one which could not be explained by any cost-

based or competitive rationale.

18.     In total, CVS paid several billions of dollars of overcharge damages for generic

drugs to the Defendants.  CVS has initiated this action to recover three times these damages from

---

[2]  Appendix B focuses upon <u>Teva's</u> coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs.  Appendix C focuses upon <u>Sandoz's</u> coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs.  Appendix D focuses upon <u>Heritage's</u> coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs.  Appendix E focuses upon <u>Taro's</u> coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs.  Appendix F focuses upon <u>Mylan's</u> coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs.  Appendix G focuses upon <u>Perrigo's</u> coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs.  Appendix H focuses upon <u>G&W's</u> coordination with other Defendants to Specific examples of G&W's coordination with other Defendants to allocate markets related to and fix, maintain and stabilize the prices of Price-Fixed Drugs. The particular conspiratorial actions referenced in these Appendices are all subsumed within and are part of Defendants' Overarching Conspiracy.

these Defendants, in addition to reasonable attorney fees and costs that it has expended in pursuing this action, pursuant to Clayton Act § 4.

## JURISDICTION AND VENUE

19.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages and injunctive relief, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

20.     This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below:

(a)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the sale of generic drugs to Plaintiffs and others at supra-competitive prices;

(b)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, and, therefore, venue is proper under 15 U.S.C. § 22; and/or

(d)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

22.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, or is found in this District. Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling generic drugs throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Complaint, each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling one or more generic drugs to Plaintiffs and others in this District at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the Commonwealth in which this Federal Court sits because, as alleged in this Complaint, each Defendant has transacted business in the Commonwealth, each Defendant has contracted to supply services or things in this

9

Commonwealth, each Defendant has caused harm by acts taken within this Commonwealth, each Defendant has caused harm in this Commonwealth by acts or omissions outside this Commonwealth, each Defendant has committed violations of 15 U.S.C. § 1 within this Commonwealth, and because the Commonwealth's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the Commonwealth to satisfy due process; and/or

(e)     Defendants and one or more of their co-conspirators contracted to supply services or goods, including generic drugs, in the Commonwealth where this Federal Court sits; money flowed from Plaintiffs or other purchasers in the Commonwealth to pay Defendants and their co-conspirators for generic drugs; Defendants and one or more of their co-conspirators transact business in the Commonwealth in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this Complaint to be done, or consequences to occur, in the Commonwealth; Defendants and their co-conspirators engaged in unlawful conduct described in this Complaint outside of the Commonwealth causing injury to Plaintiffs in the Commonwealth, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this Commonwealth or the Constitution of the United States.

(f)     Defendants are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and

conspiratorial conduct at the United States (including the forum Commonwealth) and have purposefully availed themselves of the laws of the United States. As alleged in this Complaint, each Defendant, either directly, or indirectly through their subsidiaries, engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum Commonwealth and the United States.

## PARTIES

### PLAINTIFFS

23.    Plaintiff CVS Pharmacy, Inc. ("CVS") is a corporation organized and existing under the laws of Rhode Island with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  CVS, either directly or indirectly through its subsidiaries or affiliates, operates retail pharmacies and purchases substantial quantities of branded and generic pharmaceutical products and other goods for resale to the public through approximately 9,900 drugstores, 151 long-term care facility pharmacies, 11 mail service pharmacies, and 27 specialty pharmacies.

24.    CVS's long-term care facility pharmacies are operated by Omnicare, Inc. and its subsidiaries ("Omnicare").  Omnicare became a wholly-owned subsidiary of CVS Pharmacy in 2015.  Both before and after the CVS acquisition, Omnicare provided its services to skilled nursing facilities, assisted living facilities, independent living communities, hospitals, and other health care service providers, representing more than 1.4 million beds in 47 states.[3]

---

[3]  Through the cover complaint and the appendices, interactions with Omnicare prior to its acquisition by CVS are identified as Omnicare.

25.     CVS brings this action on its own as a direct purchaser of generic drugs and as the assignee of Cardinal Health, Inc. ("Cardinal") and McKesson Corporation ("McKesson"). Cardinal and McKesson are national pharmaceutical wholesalers, which, during the relevant period, purchased the generic pharmaceutical drugs that are the subject of this Complaint directly from Defendants for resale to CVS Pharmacy.

**DEFENDANTS**

26.     **Teva:** Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized and existing under the laws of Delaware with its principal place of business in North Wales, Pennsylvania.  Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation.  At all times relevant to the Complaint, Teva has marketed and sold generic pharmaceuticals throughout the United States and in this District.

27.     **Actavis:** Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a corporation organized and existing the laws of Delaware with its principal place of business in Parsippany, New Jersey.  Actavis Holdco is a wholly-owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc.  In August 2016, Defendant Teva acquired the Actavis generics business of Allergan plc, including Actavis, Inc. (formerly known as Watson Pharmaceuticals).  Upon the acquisition, Actavis, Inc. was renamed Allergan Finance, LLC, which, in turn, assigned the assets and liabilities of the former Allergan plc generics business to the newly formed Actavis Holdco, including subsidiaries Defendant Actavis Pharma, Inc. and Defendant Actavis Elizabeth LLC, among others.

28.     Defendant Actavis Pharma, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco, (which is wholly-owned by Teva USA) and is a principal

12

operating company in the United States for Teva USA's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

29.     Defendant Actavis Elizabeth LLC is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco.

30.     Unless addressed individually, Actavis Holdco, Actavis Pharma, Inc., Actavis Elizabeth LLC, and any other subsidiary of Actavis Holdco are collectively referred to herein as "Actavis."  At all times relevant to the Complaint, Actavis has marketed and sold generic pharmaceuticals throughout the United States and in this District.

31.     **Sandoz:** Defendant Sandoz, Inc. ("Sandoz USA") is a corporation organized and existing under the laws of Colorado with its principal place of business in Princeton, New Jersey. Sandoz USA has, at all times relevant to this Complaint, sold and marketed generic drugs throughout the United States and in this District that its parent, Sandoz International GmbH ("Sandoz Germany"), has developed and manufactured.  Sandoz USA and Sandoz Germany are both owned by Novartis International AG, a global pharmaceutical company based in Basel, Switzerland.  Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a corporation organized and existing under the laws of New York with its principal place of business in Melville, New York.  Fougera has, at all times relevant to this Complaint, sold and marketed generic drugs throughout the United States and in this District.  In 2012, Novartis International AG acquired Fougera.  Unless addressed individually, Sandoz USA and Fougera are collectively referred to herein as "Sandoz."

32.     **Heritage:** Defendant Heritage Pharmaceuticals, Inc. ("Heritage") (now known as Avet Pharmaceuticals Inc.) is a corporation organized and existing under the laws of Delaware with its principal place of business located in Mahwah, New Jersey.  In April 2011, Defendant

Emcure Pharmaceuticals, Ltd. ("Emcure") acquired Heritage.  Emcure is an Indian company with its principal place of business located in Pune, India.  Heritage serves as the exclusive U.S. commercial footprint for Emcure and works in close cooperation with Emcure's global research and development and business development teams.  Defendants Heritage and Emcure regularly act in concert to transact business throughout the United States and within Pennsylvania, including but not limited to marketing, distribution, sales, and/or offers to sell generic drugs.  At all times relevant to the Complaint, Heritage has marketed and sold generic pharmaceutical drugs throughout the United States and in this District.

33.    **Taro:** Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a corporation organized and existing under the laws of New York with its principal place of business in Hawthorne, New York.  Taro is a wholly-owned subsidiary of Defendant Taro Pharmaceutical Industries Ltd. ("Taro Israel"), an Israeli pharmaceutical company.  At all times relevant to the Complaint, Taro has marketed and sold generic pharmaceutical drugs throughout the United States and in this District.

34.    **Sun:** Defendant Sun Pharmaceutical Industries, Inc. ("Sun") (formerly known as Caraco Pharmaceutical Laboratories, Ltd.) is a corporation organized and existing under the laws of Michigan with its principal place of business in Cranbury, New Jersey.  Sun is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian corporation, which also owns a majority stake in Taro Israel and Taro.  At all times relevant to the Complaint, Sun has marketed and sold generic pharmaceuticals throughout the United States and in this District.

35.    **Mylan:** Defendant Mylan Inc. has been a corporation organized and existing under the laws of Pennsylvania with its principal executive offices located at 405 Lexington Avenue, Floor 52, New York, New York 10174.  Mylan Inc. has been an indirect, wholly-owned

subsidiary of Defendant Mylan N.V., an entity incorporated in the Netherlands.  Mylan N.V.'s

principal executive offices are located at Building 4, Trident Place, Hertfordshire AL10 9UL,

United Kingdom.

36.     In early 2015, Mylan Inc.'s business was reorganized under Mylan N.V. and led

by the former officers and directors of Mylan Inc.  On February 27, 2015, Mylan N.V. succeeded

Mylan Inc. as the SEC registrant.  Mylan N.V.'s common stock began trading on the Nasdaq

Global Select Market on March 2, 2015 under the ticker symbol "MYL."

37.     Defendant Mylan Pharmaceuticals Inc. ("Mylan Pharma") has been a corporation

organized and existing under the laws of West Virginia with its principal place of business in

Morgantown, West Virginia.  It has been a subsidiary of Mylan Inc.  Mylan Pharma is registered

with the Pennsylvania Department of State as a foreign corporation and maintains a registered

agent in Pennsylvania.  Mylan Specialty L.P. has been a limited partnership organized and

existing under the laws of Pennsylvania with its principal place of business in Canonsburg,

Pennsylvania.  Mylan Specialty L.P. has been a wholly-owned subsidiary of Defendant Mylan

Inc.  Defendant Mylan Institutional Inc. has been a corporation organized and existing under the

law of Illinois with its principal place of business in Canonsburg, Pennsylvania. Defendant

Mylan Institutional Inc., formerly known as UDL Laboratories, Inc. ("UDL"), has been a wholly

owned subsidiary of Defendant Mylan Inc.  Unless addressed individually, Mylan Inc., Mylan

Pharma, Mylan Specialty L.P., and Mylan Institutional Inc. are collectively referred to herein as

"Mylan."

38.     Mylan, together with its subsidiaries, has developed, licensed, manufactured,

marketed, and distributed generic, and specialty pharmaceuticals worldwide.  Mylan has

marketed and sold generic pharmaceuticals throughout the United States and in this District.

15

39.     **Greenstone:** Defendant Greenstone LLC ("Greenstone") has been a Delaware limited liability company with its principal place of business located in North Peapack, New Jersey.  Greenstone has been a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a global pharmaceutical company organized and existing under the laws of New York.  Pfizer has treated Greenstone as its generics division or as an internal business unit rather than as a separate and independent entity, controlling and directing Greenstone's business activities, including, but not limited to, Greenstone's marketing and sale of generic drugs.  Greenstone has been part of the Pfizer business unit called the Global Established Pharmaceuticals Division, which is now called Pfizer Essential Health.

40.     Both Pfizer and Greenstone have shared the same office space at Pfizer's Peapack, New Jersey campus.  Pfizer and Greenstone have also shared common officers and managerial and supervisory personnel, including the same President, Chief Executive Officer, Chief Operating Officer, Chief Commercial Officer, and many Vice-Presidents.  The highest-ranking position at Greenstone has been the General Manager, a position held by a Pfizer employee that reports directly to higher-level executives at Pfizer.

41.     A majority of Greenstone's employees have also been, at the same time, employees of Pfizer's Essential Health Division, including two of the individuals identified herein as having conspired on behalf of Greenstone – Jill Nailor and Robin Hatosy.  Pfizer employees have been paid directly by Pfizer, and Pfizer is listed as their employer in W-2 Wage and Tax Statements submitted to the United States government.  Greenstone employees have been included on Pfizer organizational charts – demonstrating that Greenstone was acting as an internal division with Pfizer rather than a separate company.

16

42.     In their communications internally and with customers and competitors, both Nailor and Hatosy regularly used e-mail addresses that ended with Pfizer's e-mail domain: "@pfizer.com."  This is the case for most, if not all, of Greenstone's "employees."  Nailor and Hatosy also both received shares of Pfizer stock as compensation for their work, in addition to their Pfizer-paid salaries.  They were reimbursed and/or compensated by Pfizer through its accounts payable system for membership in industry trade associations; they used Pfizer cell phones and/or iPads; and they used Pfizer teleconference and webex services to conduct their work.

43.     Pfizer has performed many of the important business functions of Greenstone that an independent corporate entity would typically perform on its own, including but not limited to: (1) financial and sales analysis, (2) business technology, (3) customer service, (4) legal, (5) intellectual property, (6) supply chain, (7) human resources and (8) employee benefits. Importantly, Greenstone – which as of 2017 was the 15th largest generic manufacturer in the U.S. with annual gross sales of over one billion dollars – has not had its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department – all critical functions for a legitimate business operation.  All of those functions have been performed by Pfizer.

44.     Pfizer has performed financial analyses, sales reports, revenue projections, and other finance functions for Greenstone.  Since at least January 2013, these tasks have been performed by Pfizer's Director of Business Finance.

45.     Greenstone has not had its own separate IT infrastructure, and Pfizer has provided access to its bid-tracking software and other business tools so that Greenstone can keep track of

its operations, including but not limited to budget, supply, pricing, molecules sold, competition, market share, and financial performance generally.

46.     Greenstone has promoted itself publicly as a marketing or distribution wing of Pfizer, specifically adopting the Pfizer logo in its marketing materials. Greenstone has consistently advertised its connection with Pfizer in order to strategically capitalize on Pfizer's brand recognition and respect, for purposes of increasing its own sales.  In carrying out its business, Greenstone's internal training and marketing documents have regularly carried Pfizer's trademarked logo and brand name.  This has included internal "Greenstone" presentations relating solely to generic drugs and issues specific to the generic pharmaceutical industry.

47.     Because Greenstone has operated as part of Pfizer, Pfizer has been directly involved in the generics business and has extensively evaluated generic competitors, price erosion in the generic industry, and other strategic issues on behalf of Greenstone.  Greenstone and Pfizer management have regularly coordinated on strategy, and communicated about concepts such as "fair share," "responsible pricing" and following other competitors' price increases in particular generic drug markets.  Pfizer employees also have worked directly with the FDA on Greenstone's behalf to obtain approval for the drugs that Greenstone sells.

48.     Greenstone has also relied on Pfizer for cost and pricing strategy.  For new products in particular, Pfizer's Global Supply unit ("PGS") has made the budget, defined the costs of goods sold, and then conveyed that information to Greenstone without significant feedback.  PGS has also been heavily involved in deciding which new molecules will be produced and/or sold by Greenstone.

49.     In every important respect, including financially, Pfizer had directly controlled the decision-making of Greenstone.  Greenstone did not even have the authority to implement its

18

own price increases without first obtaining the approval of Pfizer. This includes the price increases discussed below. Not only did Pfizer have to approve Greenstone's price increases, but it also directed Greenstone's strategy regarding the increases, and Greenstone always acted at the direction of Pfizer (at least prior to the Viatris transaction identified below). For these reasons, Greenstone has only been a "separate entity" in name only. Any actions attributed to Defendant Greenstone throughout this Complaint, including specifically those of Jill Nailor or Robin Hatosy, have been actions taken, directed, and/or controlled by Pfizer.

50.   Unless addressed individually, Greenstone and Pfizer are collectively referred to herein as "Greenstone."

51.   **Viatris:** Defendant Viatris Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania. It represents the combination of the generic drug business of Defendants Mylan and Pfizer (including Greenstone). The transaction combining these businesses in the form of Viatris closed on November 16, 2020. Viatris is a successor-in-interest, at least to some extent, to Mylan and/or Greenstone, and thus is liable to CVS for actions taken by Mylan and/or Greenstone.

52.   **Perrigo:** Defendant Perrigo New York, Inc. ("Perrigo") is a corporation organized and existing under the laws of Delaware with its executive offices in Allegan, Michigan and its primary business location in Bronx, New York. It is a wholly-owned subsidiary of Defendant Perrigo Company, plc, an Irish company with its principal place of business in Dublin, Ireland. At all times relevant to the Complaint, Perrigo has marketed and sold generic pharmaceuticals throughout the United States and in this District.

53.     **G&W:** Defendant G&W Laboratories, Inc. ("G&W") is a corporation organized and existing under the laws of New Jersey with its principal place of business in South Plainfield, New Jersey.  At all times relevant to the Complaint, G&W has marketed and sold generic pharmaceuticals throughout the United States and in this District.

54.     **Amneal:** Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a corporation organized and existing under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.  It is the parent company of Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC").  Amneal LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.  Amneal Inc. owns a portion of Amneal LLC and, as the managing member of Amneal LLC, conducts and exercises full control over all activities of Amneal LLC.

55.     Defendant Impax Laboratories, LLC ("Impax") (formerly known as Impax Laboratories, Inc.) is a limited liability company organized and existing under the laws of Delaware.  Impax is a wholly-owned subsidiary of Amneal Pharmaceuticals LLC.  Global Pharmaceuticals was the generic products division of Impax.

56.     Defendant Amneal Pharmaceuticals of New York, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.  Amneal Pharmaceuticals of New York LLC is an indirect wholly-owned subsidiary of Amneal Pharmaceuticals, Inc.  Unless addressed individually, Amneal Inc., Amneal LLC, Amneal Pharmaceuticals of New York, LLC, and Impax are collectively referred to herein as "Amneal."  At all times relevant to the Complaint, Amneal has marketed and sold generic pharmaceuticals throughout the United States and in this District.

57.    **Alvogen:** Defendant Alvogen Inc. ("Alvogen") is a corporation organized and existing under the laws of Delaware with its principal place of business in Pine Brook, New Jersey.  It is a privately held company that was founded in 2009 by a former CEO of Defendant Actavis.  At all times relevant to the Complaint, Alvogen has marketed and sold generic pharmaceuticals throughout the United States and in this District.

58.    **Apotex:** Defendant Apotex Corp. ("Apotex") is a corporation organized and existing under the laws of Florida with its principal place of business in Weston, Florida.  Apotex is a direct, wholly-owned subsidiary of Aposherm Delaware Holding Corporation, which is an indirect, wholly-owned subsidiary of Apotex Holdings, Inc.  At all times relevant to the Complaint, Apotex has marketed and sold generic pharmaceuticals throughout the United States and in this District.

59.    **Ascend:** Defendant Ascend Laboratories, LLC ("Ascend") is a corporation organized and existing under the laws of New Jersey with its principal place of business in Parsippany, New Jersey.  Ascend is a wholly-owned subsidiary of Alkem Laboratories Ltd, an Indian corporation headquartered in Mumbai that manufactures and sells pharmaceutical generics.  At all times relevant to the Complaint, Ascend has marketed and sold generic pharmaceuticals throughout the United States and in this District.

60.    **Aurobindo:** Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey.  Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India.  At all times relevant to the Complaint, Aurobindo Pharma USA, Inc. has marketed and sold generic pharmaceuticals throughout the United States and in this District.

61.     **Breckenridge:** Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Connecticut company with its principal place of business in Berlin, Connecticut.  Breckenridge operates as a pharmaceutical marketing, research, and development company.  It is an indirect, wholly-owned subsidiary of Towa Pharmaceutical Co., Ltd., a Japanese pharmaceutical company. At all times relevant to the Complaint, Breckenridge has marketed and sold generic pharmaceuticals throughout the United States and in this District.

62.     **Camber:** Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey.  Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company.  At all times relevant to the Complaint, Camber Pharmaceuticals, Inc. has marketed and sold generic pharmaceuticals throughout the United States and in this District.

63.     **Cintron:** Defendant Citron Pharma, LLC is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey.  Aceto Corporation purchased Citron's generic drugs assets in 2016.  At all times relevant to the Complaint, Citron Pharma, LLC has marketed and sold generic pharmaceuticals throughout the United States and in this District.

64.     **Dr. Reddy's:** Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a corporation organized and existing under the laws of New Jersey with its principal place of business located in Princeton, New Jersey.  Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company.  At all times relevant to the Complaint, Dr. Reddy's has marketed and sold generic pharmaceuticals throughout the United States and in this District.

65.     **Endo:** Defendant Endo International plc is an Irish company with its principal place of business in Dublin, Ireland, and its U.S. headquarters in Malvern, Pennsylvania. Defendant Endo Pharmaceuticals, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Malvern, Pennsylvania.  Endo Pharmaceuticals, Inc. is a wholly-owned subsidiary of Defendant Endo Health Solutions, Inc., which is also incorporated in Delaware with its principal places of business in Malvern, Pennsylvania.  Unless addressed individually, Endo International plc and Endo Pharmaceuticals, Inc. are collectively referred to as "Endo."  At all times relevant to the Complaint, Endo has marketed and sold generic pharmaceuticals throughout the United States and in this District.

66.     **Epic:** Defendant Epic Pharma, LLC ("Epic") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Laurelton, New York.  Epic is wholly owned by Humanwell Healthcare USA LLC.  Humanwell Healthcare USA LLC is wholly owned by Humanwell Healthcare International Ltd., an Ireland corporation, which is wholly owned by Humanwell Healthcare Group Co., Ltd., a Chinese corporation. At all times relevant to the Complaint, Epic has marketed and sold generic pharmaceuticals in this District and throughout the United States.

67.     **Glenmark:** Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a corporation organized and existing under the laws of Delaware with its principal place of business in Mahwah, New Jersey.  Glenmark is a subsidiary of Glenmark Pharmaceuticals, Ltd., an Indian corporation with its headquarters in Mumbai, India.  At all times relevant to the Complaint, Glenmark has marketed and sold generic pharmaceuticals throughout the United States and in this District.

68.     **Hikma:** Defendant Hikma Pharmaceuticals USA, Inc. (formerly known as West-Ward Pharmaceuticals Corp.) ("Hikma") is a corporation organized and existing under the laws of Delaware with its principal place of business in Eatontown, New Jersey.  Defendant West-Ward Columbus, Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  Defendant Hikma Labs, Inc., formerly known as Roxane Laboratories, Inc., is a Nevada corporation with its principal place of business in Eatontown, New Jersey.  Hikma, Hikma Labs, Inc., and West-Ward Columbus, Inc. are all subsidiaries of Hikma Pharmaceuticals plc, a public liability company based in London, England.  Unless addressed individually, Hikma, Hikma Labs Inc., and West-Ward Columbus, Inc. are collectively referred to herein as "West-Ward." At all times relevant to the Complaint, West-Ward has marketed and sold generic pharmaceuticals throughout the United States and in this District.

69.     **Jubilant Cadista:** Defendant Jubilant Cadista Pharmaceuticals Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Salisbury, Maryland.  Jubilant Cadista Pharmaceuticals Inc. is a wholly-owned subsidiary of Cadista Holding Inc., whose ultimate parent company is Jubilant Life Sciences Limited.  At all times relevant to the Complaint, Jubilant Cadista Pharmaceuticals Inc. has marketed and sold generic pharmaceuticals throughout the United States and in this District.

70.     **Lannett:** Defendant Lannett Company, Inc., ("Lannett") is a Delaware corporation with its  principal place of business at 9000 State Road, Philadelphia, Pennsylvania 19136.  At all times  relevant to the Complaint, Lannett has marketed and sold generic pharmaceuticals throughout the United States and in this District.

71.     **Lupin:** Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a corporation organized and existing under the laws of Delaware with its principal place of business in

Baltimore, Maryland.  Lupin is a wholly-owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India.  At all times relevant to the Complaint, Lupin has marketed and sold generic pharmaceuticals throughout the United States and in this District.

72.    **Mayne:** Defendant Mayne Pharma, Inc. is a corporation organized and existing under the laws of North Carolina with its principal place of business in Raleigh, North Carolina. Mayne Pharma, Inc. is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business in Salisbury, Australia.  Defendant Mayne Pharma USA, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business located in Paramus, New Jersey.  Mayne Pharma USA, Inc. is a directly wholly-owned subsidiary of Mayne Pharma Group Limited.  Unless addressed individually, Mayne Pharma, Inc., Mayne Pharma USA, Inc., and Mayne Pharma Group Limited are collectively referred to herein as "Mayne." At all times relevant to the Complaint, Mayne has marketed and sold generic pharmaceuticals throughout the United States and in this District.

73.    **Par:** Defendant Par Pharmaceutical, Inc. ("Par") is a corporation organized and existing under the laws of New York with its  principal place of business located in Chestnut Ridge, New York.  Defendant Par Pharmaceutical Companies, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Chestnut Ridge, New York.

74.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").  At all times relevant to the Complaint,

Generics Bidco has marketed and sold generic pharmaceuticals throughout the United States and in this District.

75.     Defendant DAVA Pharmaceuticals LLC is a Delaware company with its principal place of business in Fort Lee, New Jersey.   At all times relevant to the Complaint, DAVA Pharmaceuticals LLC has marketed and sold generic pharmaceuticals throughout the United States and in this District.

76.     Defendants Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Generics Bidco I, LLC, and DAVA Pharmaceuticals, LLC are all indirectly wholly-owned subsidiaries of Defendant Endo International plc.  Unless addressed individually, Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Generics Bidco I, LLC, and DAVA Pharmaceuticals, LLC are collectively referred to herein as "Par."  At all times relevant to the Complaint, Par has marketed and sold generic pharmaceuticals throughout the United States and in this District.

77.     **Teligent:** Defendant Teligent, Inc., formerly known as IGI Laboratories, Inc., is a Delaware corporation with its principal place of business in Buena, New Jersey.  At all times relevant to the Complaint, Teligent, Inc. has marketed and sold generic pharmaceuticals throughout the United States and in this District.

78.     **Torrent:** Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey.  Torrent is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd., an Indian pharmaceutical company.  At all times relevant to the Complaint, Torrent has marketed and sold generic pharmaceuticals throughout the United States and in this District.

79.     **Upsher-Smith:** Defendant Upsher-Smith Laboratories, LLC (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a limited liability company organized and existing under the laws of Minnesota with its principal place of business located in Maple Grove, Minnesota.  Upsher-Smith is a wholly-owned subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan.  At all times relevant to the Complaint, Upsher-Smith has marketed and sold generic pharmaceuticals throughout the United States and in this District.

80.     **Valeant:** Defendant Bausch Health Americas, Inc. (formerly known as Valeant Pharmaceuticals International Inc.) is a corporation organized and existing under the laws of Delaware with its U.S. headquarters located in Bridgewater, New Jersey.

81.     Defendant Bausch Health US, LLC (formerly known as Valeant Pharmaceuticals North America LLC) is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.  Bausch Health US, LLC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

82.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a corporation organized and existing under the laws of Delaware with its principal place of business in Aliso Viejo, California.  Oceanside is a wholly-owned subsidiary of Bausch Health Americas, Inc. Unless addressed individually, Bausch Health Americas, Inc. and Bausch Health US, LLC, and Oceanside are collectively referred to herein as "Valeant."  At all times relevant to the Complaint, Valeant has marketed and sold generic pharmaceuticals throughout the United States and in this District.

83.     **Wockhardt:** Defendant Wockhardt USA LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Wockhardt USA LLC

is a wholly owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc., a Delaware corporation with its principal place of business in Morton Grove, Illinois.  Unless addressed individually, Defendants Wockhardt USA LLC and Morton Grove Pharmaceuticals, Inc. are referred to together as "Wockhardt."  At all times relevant to the Complaint, Wockhardt has marketed and sold generic pharmaceuticals throughout the United States and in this District.

84.    **Zydus:** Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a corporation organized and existing under the laws of New Jersey with its principal place of business in Pennington, New Jersey.  Zydus is a wholly-owned subsidiary of Cadila Healthcare Ltd (also known as Zydus Cadila), an Indian pharmaceutical company headquartered in Ahmedabad, Gujarat, India.  At all times relevant to the Complaint, Zydus has marketed and sold generic pharmaceuticals throughout the United States and in this District.

## Co-Conspirators

85.    Various other persons, firms and corporations, not named as defendants have participated as co-conspirators and have performed acts and made statements in furtherance of the conspiracy. Such co-conspirators specifically include, but are not limited to, managers, officers, employees, and agents acting on Defendants' behalf that Defendants governed and/or operated and in which they participated.

86.    Entities that conspired with Defendants also include, but are not limited to, the following: (a) Akorn, Inc., including its subsidiaries Hi-Tech Pharmacal Co., Inc. and Versapharm, Inc.; (b) Kavod Pharmaceuticals LLC (formerly known as Rising Pharmaceuticals, LLC and Rising Pharmaceuticals, Inc. and d/b/a Rising Pharmaceuticals); and (c) Mallinckrodt plc, including its subsidiaries Mallinckrodt LLC and Mallinckrodt Inc.  Managers, officers,

employees, and agents, acting on behalf of these entities or their subsidiaries and affiliates, also participated in the conspiracies discussed herein.

87.     Individuals that conspired with and on behalf of Defendants include, but are not limited to, the following:

a.     Nisha Patel (Director of Strategic Customer Marketing at Teva);

b.     Maureen Cavanaugh (Senior Executive at Teva);

c.     David Rekenthaler (Vice President of Sales for US Generics at Teva, Vice President of Sales at Apotex);

d.     Kevin Green (Director of National Accounts at Teva; Associate Vice-President of National at Zydus);

e.     Armando Kellum (Director of Pricing and Contracts at Sandoz);

f.     Ara Aprahamian (former Vice-President of Sales and Marketing Executive at Taro; former Director of Contracting at Actavis);

g.     Mike Perfetto (Chief Commercial Officer at Taro; former Vice-President of Sales and Marketing at Actavis);

h.     Mitchell Blashinsky (former Vice-President of Marketing and Business Development at Taro);

i.     Mark Falkin (former Vice President of Marketing, Pricing and Contracts at Actavis);

j.     Rick Rogerson (former Executive Director of Pricing and Business Analytics at Actavis);

k.     Susan Knoblauch (former Senior Manager of Sales at Sun);

l.      Anne Sather (former National Account Manager and Senior Director in National Accounts at Heritage);

m.      Daniel Lukasiewicz (Vice-President of Sales and Marketing at Heritage; former Vice-President of Sales and Marketing at Zydus);

n.      Jason Malek (former President of Heritage);

o.      Jeffrey Glazer (former Chief Executive Officer of Heritage);

p.      Keith Fleming (former Director of Pricing and Contracts at Heritage);

q.      Matthew Edelson (former Senior National Account Manager at Heritage);

r.      Neal O'Mara (Director of National Accounts at Heritage);

s.      Rich Smith (Director of Global Supply Chain and Logistics at Heritage);

t.      James Nesta (Vice President of Sales at Mylan);

u.      Jan Bell (former Director, National Accounts at Mylan);

v.      Michael Aigner (Director of National Accounts at Mylan);

w.      Rajiv Malik (former President of Mylan; current President of Viatris);

x.      Jill Nailor (former Senior Director of Sales and National Accounts at Greenstone, current New Business and Customer Engagement Lead at Viatris);

y.      Tony Pohlman (National Account Manager at Perrigo);

z.      Kurt Orlofski (former President of G&W)

aa.     Erica Vogel-Baylor (former Vice-President of Sales & Marketing at G&W)

bb.     Beth Hamilton (former Vice President of Marketing at Apotex);

cc.     David Berthold (Vice President of Sales at Lupin);

dd.     G.P. Singh (former President of Sun, current Chief Executive Officer at Jubilant);

ee.     Gloria Peluso-Schmid (Director of National Accounts at Mayne);

ff.     Jim Brown (Vice-President of Sales at Glenmark);

gg.     John Adams (former Vice President of Sales and Marketing at Dr. Reddy's);

hh.     John Dillaway (Executive Vice President at Ascend);

ii.     Tracy Sullivan DiValerio (Director of National Accounts at Lannett); and

jj.     Vikas Thapar (President of Emcure).

88.     Other individual co-conspirators include, but are not limited to, individuals identified by their initials or as Cooperating Witnesses (e.g. CW-1, CW-2, etc.) by the State AGs in the various Complaints that they have submitted in this multi-district litigation.

## INTERSTATE TRADE AND COMMERCE

89.     During the time period relevant to Plaintiffs' claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of generic drugs in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the generic

drugs;

(b)     Data, information, correspondence, and/or financial material were

transmitted between each Defendant in the State in which each is located,

incorporated, or has its principal place of business and other States;

(c)     Money flowed between banks outside of the State in which each

Defendant is located, incorporated, or has its principal place of business

and other States; and/or

(d)     Defendants and their co-conspirators imported substantial quantities of

raw materials for generic drugs from outside the United States.

90.     The effect of Defendants' and/or their co-conspirators' anticompetitive conduct

on United States commerce gives rise to Plaintiffs' claims.

91.     At all times relevant to this Complaint, the activities of the Defendants in

manufacturing, selling and distributing generic pharmaceutical drugs, including but not limited

to those identified herein, among others, were in the regular, continuous and substantial flow of

interstate trade and commerce and have had and continue to have a substantial effect upon

interstate commerce. The Defendants' activities also had and continue to have a substantial effect

upon the trade and commerce within each of the states in which Plaintiffs conduct business.

## FACTUAL ALLEGATIONS

**I.     GENERIC DRUGS AND GENERIC COMPETITION**

**A.     *The Hatch-Waxman Act***

92.     Congress enacted the 1984 Hatch-Waxman Act to encourage drug innovation,

while simultaneously promoting competition between generic drugs in order to lower drug

prices.

93. Entities that develop new drugs often prosecute, and are awarded, a patent by the U.S. Patent & Trademark Office.  Thereafter, to market and sell the drug in the U.S., the entity must gain approval from the FDA to do so.  Gaining such FDA approval involves submitting a new drug application ("NDA") that demonstrates that the drug is safe and effective for its intended use.  The process of developing and gaining regulatory approval for a drug can take many years and cost tens or hundreds of millions of dollars.

94. However, it is usually well worth the cost: a drug manufacturer that is awarded a valid patent has the exclusive rights to market and sell the drug for a period of time.  During the period of patent protection, the manufacturer typically will market and sell its drug under a "brand" name.  Moreover, given that the manufacturer of the branded drug can exclude competition under its patent rights (and there are generally no pharmacological substitutes for the branded drug), the branded drug manufacturer is generally able to set extremely high prices for its drug.

95. The Hatch-Waxman Act set forth an efficient process for additional firms to receive FDA approval to manufacture and sell "generic" or "bioequivalent" versions of the brand-name drug, assuming that the branded drug's patent is either deemed invalid or has otherwise expired.  To encourage faster approval for generic versions of brand-name drugs, the Hatch-Waxman Act allowed generic drug manufacturers to file an "abbreviated new drug application" ("ANDA").  To have its ANDA approved, the generic drug manufacturer-filers are generally not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness.  Instead, generic applicants must merely scientifically demonstrate that their product performs in the same manner as the innovator drug in order to market and sell the generic drug.  The ANDA process thus allows generic manufacturers to avoid conducting costly

33

and duplicative clinical trials.

96.     As with their branded equivalents, generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments and creams, and at various strengths.[4]

> **B.     *Relevant Entities in the Drug Distribution System***

97.     Generic drug distribution in the United States involves various types of entities at different levels of the pharmaceutical supply chain.

98.     All generic drugs are supplied by drug manufacturers.  Generic drug manufacturers operate manufacturing facilities, and compete with each other to sell the generic drugs that they produce to wholesalers, distributors, and directly to pharmacy chains that may include, among other things, retail stores, long term care facility pharmacies and mail order pharmacies, like those owned and operated by CVS.  Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively.  Drug manufacturers typically sell their products through supply agreements negotiated with their customers.

99.     Generic manufacturers often do not attempt to differentiate their products from those of other manufactures because a generic drug is functionally a homogenous commodity, with competition generally dictated by price and supply.  As a result, generic drug manufacturers usually all market the drug under the same name, which is the name of the active ingredient (e.g., Clobetasol).  However, different generic manufacturers may produce one or more formulations

---

[4]  From a regulatory perspective, and from a purchasing and prescribing perspective, each formulation, dose, and strength of a generic pharmaceutical is considered a unique drug. However, for ease of reference, generics may be referred to by their ingredient names alone, or by their ingredients plus their form.

and strengths of generic drugs including the same active ingredient.  For example, Clobetasol is manufactured as a solution, cream, foam, gel and ointment, and commonly comes in strengths of .05%, 1% and 2%.

100.    The Defendants are all generic drug manufacturers who have ostensibly competed with one another to sell generic pharmaceutical drugs.  Each has had a broad portfolio of generic drugs that it has sold to retailers, like CVS, distributors, and group purchasing organizations, many of whom have had a nationwide presence.

101.    Defendants' business plans and strategies for their broad portfolios have specifically focused on selling to large nationwide purchasers, including large retail and mail order pharmacies with a nationwide presence, such as those owned and operated by CVS. Defendants have directly sold and, in turn, CVS has directly purchased their generic drugs.  CVS has directly purchased billions of dollars-worth of generic drugs annually from generic drug manufacturers during the time period relevant to this case.

102.    Wholesalers have also purchased generic pharmaceutical products from manufacturers and have distributed them to a variety of customers, including pharmacies such as CVS.  CVS has purchased generic drugs through wholesalers including Cardinal and McKesson.

C.    *Generic Drug Pricing*

103.    FDA-approved generic versions of drugs are bioequivalent to other drugs that contain the same active ingredients.  The primary distinguishing factor between these drugs (and the original "branded" drug containing the relevant ingredients) is price.[5]

---

[5]    References to generic drug pricing in this Complaint may refer to the different prices used in the pharmaceutical industry, including the drug's: (a) Wholesale Acquisition Cost ("WAC"), which is a price provided by certain nationally-available reporting services representing the list price at which wholesalers may purchase drug products from a manufacturer as reported by that manufacturer; (b) the contracted prices that CVS or other direct purchasers

104.    Relevant economic literature establishes that, as generic drugs are effectively commodities, generic entry should result, and, prior to the conspiracies at issue, has resulted, in lower drug prices – prices close to the marginal cost of supplying the drug.  Historically, before generic entry, brand drugs have accounted for 100% market shares, and, consequently, they have generally enjoyed the ability to set prices without regard to competitive market forces.  However, when the first generic entered the market, it was typically priced much lower than the brand equivalent (on average 39% less), and, accordingly, the brand drug began to rapidly lose market share.  Then, as additional manufacturers entered the market and because of state laws that require pharmacies to dispense generic drugs unless physicians explicitly prescribe otherwise, competition pushed the drug price down even more dramatically, resulting in numerous suppliers vying for share and prices that may be as low as 95% of the original drug price.   The Federal Trade Commission estimates that, about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  In mature markets with 19 or more generic manufacturers, the price of the generic drug is as low as 6% of the branded version. [6]  This phenomenon is demonstrated in the following chart prepared by the FDA:

---

pay the manufacturer to purchase the referenced drug directly from the manufacturers; (c) National Drug Average Drug Acquisition Cost ("NADAC"), a price published by the Centers for Medicare and Medicaid Services; or in some cases (d) Average Wholesale Price ("AWP"), a price index provided by certain nationally-available reporting services.

[6]  FED. TRADE COMM'N, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS (2010); Conrad, Ryan and Lutter, Randall, *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Prices*, FDA, Center for Drug Evaluation and Research Report, Dec. 2019, *available at* https://www.fda.gov/media/133509/download.



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

## II. DEFENDANTS' OVERARCHING CONSPIRACY TO ALLOCATE DRUG BUSINESS AND INCREASE GENERIC DRUG PRICES

### A. *Defendants had the Incentive to Conspire*

105.     Each of the Defendants had an incentive to conspire.  As they each supplied

commodity-like generic drugs that offered no significant differentiation from bioequivalent

products other than price, their profit margins were constrained by unfettered competition.

106.     This competition has resulted in substantially lower drug costs, significantly

benefitting the U.S. economy.  Since the passage of the Hatch-Waxman Act, generic drugs have

moved from accounting for less than 20% to accounting for nearly 90% of total prescriptions

filled in the United States.[7]  In 1983, before the Hatch-Waxman Amendments, only 35% of the

top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.[8]  It has

---

[7]  *See* HHS Generic Drugs in the US – Policies to Address Pricing and Competition (Page 2) " In 2016, generic drugs accounted for only 27% of overall U.S. drug spending yet constituted 89% of drug prescriptions in the U.S. (7), a dramatic increase from just 19% of prescriptions in 1984.

[8]  *See* 1998 CBO Study, page 53.

been reported that, in 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.[9]

107.    Defendants were keenly aware of how their profit margins were being constrained by the rampant competition in generic drug sales that the Hatch-Waxman Act unleashed.  They also, in turn, recognized that they could increase their margins by taking collective action to stunt these competitive forces.  Specifically, the Defendants recognized that they could increase their profits by reducing or wholly eliminating such competition by agreeing to limit their sales of generic drugs to their "fair share" and by conspiring to fix, maintain and stabilize generic drug prices.

**B.**    ***The Generic Drug Business is Conducive to Conspiracy***

108.    Features of the generic drug industry show both (i) that the industry is susceptible to collusion, and (ii) that the price increases referenced herein were, in fact, the result of collusion and not the result of conscious parallelism.

109.    As demonstrated by the factors enumerated below, the U.S. market for each of the Price-Fixed Drugs have been particularly conducive to conspiratorial conduct.  Among other things, markets for the Price-Fixed Drugs have been characterized by:

> a.    relatively few competitors and substantial market concentration, making it easier for them to effectuate a conspiracy and to assure that "cheating" does not occur.  Since 2005, consolidation has reduced the number of competitors in the generic drug industry, which has rendered it ripe for collusion.  For example, Defendant Teva acquired Ivax Corporation in

---

[9]  https://www.fiercepharma.com/pharma/ims-health-reports-u-s-prescription-sales-grew-5-1-percent-2009-to-300-3-billion.

2006, Barr Laboratories (including Pliva) in 2008, Ratiopharm (Germany's second largest generic drug producer) in 2010, and Allergan's generics business (including Actavis) in 2016.  In addition, Watson Pharmaceuticals acquired Andrx Corporation in 2006, Defendant Endo acquired Qualitest in 2010, Defendant Perrigo acquired Paddock Laboratories, Inc. in 2011, and Defendant Sandoz acquired Defendant Fougera in 2012.  Defendant Mylan merged with Defendant Pfizer's generic drug business (including Defendant Greenstone) on November 16, 2020.  As a result of this industry-wide consolidation, there were few actual suppliers of each of the Price-Fixed Drugs in the United States during the time period relevant to Plaintiffs' claims;

b.      significant barriers to entry.  Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supra-competitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supra-competitive prices. Costs of manufacture, intellectual property, and expenses related to applying for ANDAs and regulatory oversight create barriers to entry in the generic pharmaceutical industry;

c.      demand inelasticity, making it easier for Defendants to increase market-wide prices without losing sales.  Each of the Price-Fixed Drugs is medically necessary to the health and well-being of the patient for whom it is prescribed.  There is thus substantial demand inelasticity for each of the Price-Fixed Drugs.  Consequently, and notwithstanding the substantial

39

price increases alleged in this Complaint, demand for each of the Price-Fixed Drugs dropped little or not at all following the increase in price;

d.    a lack of substitutes between the Price-Fixed Drugs and other medical treatments, making it less likely that purchasers will substitutes for these Price-Fixed Drugs in the wake of a market-wide price increase;

e.    a high level of interchangeability between identical generic drugs. Because a generic drug must be the therapeutic equivalent of its branded counterpart, each generic drug that is approved for sale in the United States is interchangeable with each other generic drug of the same chemical and dosage strength. For example, a 40mg tablet of Pravastatin manufactured by Mylan has been interchangeable with a 40mg tablet of Pravastatin manufactured by Teva. Accordingly, because each of the Price-Fixed Drugs is interchangeable, a sure way that a Defendant can gain market share is by competing on price.  Given the interchangeability of identical generic drugs, it is extremely difficult to increase their prices without conspiratorial action;

f.    an absence of non-conspiring competitors;

g.    a high level of inter-firm communications, particularly between sales personnel of competitors; and

h.    shared incentives to increase price amongst suppliers – suppliers that were otherwise compete against others and reduce prices to the approximately marginal cost of supplying the drug.

C. *The Contours and Operation of the Overarching Conspiracy*

110.    The Overarching Conspiracy, which ties together all of the agreements on the Price-Fixed Drugs – is an agreed upon code that was conceived of and implemented by the Defendants in order to quash the constraining impact that unfettered competition had on the prices that they were able to charge for the drugs that they supplied.  Under this code, each competitor has been entitled to its "fair share" of sales for a particular generic drug or a number of generic drugs.  The term "fair share" is generally understood as an approximation of how much market share each competitor has been entitled to, based on the number of generic competitors supplying the relevant drug, with a potential adjustment based on the timing of entry. Once a manufacturer achieved its "fair share," it has been generally understood that the competitor will no longer compete for additional business in the sale of the relevant drug.

111.    The common goal or purpose of the Overarching Conspiracy has been to fix and maintain high prices, avoid price erosion, and serve as the basis for further supra-competitive price increases on the Price-Fixed Drugs.

112.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs.

113.    Referred to sometimes as the "rules of engagement" for the generic drug industry, the "fair share" understanding among Defendants has dictated that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.  When a third competitor enters, each competitor

41

expects to obtain a 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

114.    When a generic drug manufacturer is the first to enter a particular generic drug market on an exclusive basis, under these "rules of engagement," it has been commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.  For example, communications between Defendant Dr. Reddy's and a competitor reveal their "views" on this subject.  When Dr. Reddy's was about to enter the market for a drug in January 2013, it was written that: "If they [Dr. Reddy's] are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

115.    Conversely, those generic manufacturers that have entered later have typically been entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully herein – Defendant Lupin entered the Niacin ER market after Defendant Teva had previously been exclusive.  Teva's Nisha Patel and Lupin's David Berthold spoke directly by phone a number of times during this period, including during three calls on March 24, 2014.  That same day, Teva's David Rekenthaler sent an internal e-mail to Patel stating: "We should concede Optum then defend everything else. This should be it for Lupin. I believe this should be the 40% we were okay with conceding."  Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the Overarching Conspiracy.

116.    Defendant Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:

**Market Share - Fair Unit Share assumptions**
Order of Entry Grid
Number of Competitors

| Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Order of Entry   1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| 3 | | | 20% | 20% | 20% | 20% | 20% |
| 4 | | | | 15% | 15% | 15% | 15% |
| 5 | | | | | 10% | 10% | 10% |
| 6 | | | | | | 10% | 10% |
| 7 | | | | | | | 10% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

117.    Although these general parameters of the Overarching Conspiracy have been well-known, there is no precise method for apportioning "fair share."  The shared objective, however, of the Conspiracy has been to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

118.    This common goal of the Overarching Conspiracy was stated succinctly by Taro's Ara Aprahamian, one of the central players in these conspiracies, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter."  Taro's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

119.    This scheme to minimize or eliminate competition and allocate "fair share" has been typically implemented as follows.  First, Defendants have allocated a market for an individual drug based on the number of competitors and the timing of their entry so that each competitor has obtained an acceptable share (in their view) of the market.  Second, the competitors have agreed on ways to avoid competing on price and, at times, to significantly raise

43

price.  This pattern has been frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

120.    This "fair share" understanding has been particularly effective when a new competitor has entered the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.  When this has occurred, a new competitor either approached or would be approached by the existing competitors.  Existing competitors would then agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid.  The new competitor's transition into the market was thus seamless; the new entrant was ceded market share and immediately began charging supra-competitive price.  The competitors then continued this process of dividing up customers until the market reached a new artificial equilibrium.  This has been referred to as a "stable" market.

121.    A perfect example of how an existing competitor ceded, rather than continued to compete for, share to a new entrant occurred when in or about July 2014, Sandoz entered the market for Tobramycin.  At that time, Teva, which had been the exclusive supplier of Tobramycin prior to Sandoz's entry, agreed with Sandoz that it would cede CVS's business to Teva.  This agreement was reached in direct communications between Teva's Nisha Patel and an employee at Sandoz who is now cooperating with government enforcers (referred to herein as CW-1), both of whom were central players in these conspiracies.  According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business.  This particular market allocation led to CVS paying substantially greater amounts for Tobramycin, which is a relative expensive generic drug.

122.    Another example of one co-conspirator ceding CVS's business to another in order to elevate prices occurred in the summer of 2013 when Mylan agreed to cede the CVS business

for Doxycycline DR to Heritage.  That agreement was reached in direct communications between Heritage executives, including former President Jason Malek – who was indicted for his roles in these conspiracies and who pled guilty to these criminal charges – and executives of Mylan.

123.    "Fair share" principles have also dictated how generic drug manufacturers responded when a competitor experienced supply issues.  If the disruption was temporary, the existing competitors refrained from taking any action that might upset the market balance.  By contrast, if the disruption was for a longer term, the competitors divided up customers until each player had achieved a revised "fair share" based on the number of players remaining in the market.  For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of Defendant Mylan's products was on back order and asked Taro to bid for the business.  Taro's Aprahamian sent an internal e-mail stating "Not inclined to take on new business . . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

124.    These rules about "fair share" has applied equally to price increases.  As long as everyone was playing "fair," and the competitors believed that they had their "fair share," the larger understanding dictated that they would not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so has been viewed as "punishing" a competitor for raising prices – which has been against the "rules." Indeed, rather than competing for customers in the face of a price increase, competitors often used this as an opportunity to follow with comparable price increases of their own.

45

125.    An example of Defendants' agreements to fix, maintain and stabilize price by refusing to bid for a purchaser's business after one of them instituted a price increase concerns Taro's agreement with co-conspirators, particularly Actavis and Fougera, in July 2011.  That concerned a scheme to implement massive price increases on Clotrimazole Betamethasone Dipropionate ("CBD") products sold by Taro to, among other entities, Plaintiff CVS.  CVS, after being informed of these increases by Taro, pushed back against them and sought an alternate supplier for CBD products.  However, as a result of these conspiracies, CVS was unable to find an alternate supplier for any CBD products – as Taro's co-conspirators would not agree to provide CVS with supply of these products at a competitive price.  CVS was thus forced to concede to Taro's price increases on these products, which included a price increase of almost 400% on CBD cream and over 600% on CBD lotion.

126.    Another example of this price-fixing concerns Teva's refusal, in May 2013, to bid on particular products after Glenmark had increased prices on them.  At that time, Teva was approached by a large retail customer requesting a bid for several drugs.  Teva's Kevin Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be.  After conversations with its competitors confirming that the request for a bid was due to its competitor's price increase, Teva declined to bid.  In February 2014, Teva also refused to offer competitive pricing to CVS on the drug Tolterodine, deciding to cede the account to Greenstone as part of their "fair share" agreement, even though CVS made up 20% of Teva's Tolterodine sales.

127.    When a generic manufacturer has participated in this scheme, and prices have stayed high, this has been viewed as "playing nice in the sandbox."

46

128.    Similarly, when a generic manufacturer has been "playing nice in the sandbox," it has been generally referred to as a "responsible" or "rational" competitor.  For instance, in May 2013, a senior sales and marketing executive at Defendant Sandoz, sent an internal e-mail to a second Sandoz senior executive stating that "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop.  I would be very careful to destroy this through behavior that is too aggressive or desperation."

129.    Defendant Sandoz has also used that same terminology to refer to its competitors that are acting in accordance with "fair share" principles.  For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a "responsible competitor" and Defendant Taro as a "very responsible price competitor."

130.    Defendant Teva had its own term of art – referring to the competitors that it had the most collusive relationships with as "high quality" competitors. As explored more fully in Appendix B, Teva had long-standing relationships with these "high quality" competitors, including several of the Defendants, which affected nearly every overlapping drug that they sold. As just one example, Teva's Nisha Patel exchanged seven text messages and had two long phone calls with Taro's Ara Aprahamian on June 3 and 4, 2014.  After a lengthy 25 minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to a Teva senior marketing executive stating, "[w]e should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."

131.    Adherence to the rules regarding "fair share" has been critical to the Defendants' ability to maintain high prices.  Indeed, that was the primary purpose of the agreement.  If one

competitor did not participate (and, thus behave in accordance with) the larger understanding, it could have potentially led to unwanted competition and lower prices.

132.     "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their "fair share" and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs.  For example, in July 2013, a senior marketing executive at Sandoz sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market.  After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Sandoz's Armando Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ███████████████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

133.     The "fair share" agreement is not limited to any one generic drug; these principles have constantly informed and guided the actions that generic drug manufacturers have decided to take (or not take) both within and across products.  For example, in October 2013, a senior pricing executive at Sandoz, sent an internal e-mail, including to Sandoz employee Armando Kellum, stating that Sandoz had decided not to bid on two drugs (Haloperidol and Trifluoperazine HCL) at a large retail customer.   The Sandoz pricing executive explained his

reasoning as follows: "We have been running up against Mylan a lot lately
(Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying
to be responsible in the sandbox."

134.    Similarly, in June 2014, Sandoz chose not to bid at a customer on the drug
Benazepril HCTZ, as it was concerned that Defendant Mylan would retaliate.  At that time, a
Sandoz employee explained that: "I do not want to pursue, I believe this is due to a Mylan
increase. We have a lot of products crossing with Mylan right now, I do not want to ruffle any
feathers."  These decisions were made by Sandoz executives as a direct result of communications
between the competitors, and in the context of an ongoing understanding between Defendants
Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including
Haloperidol, Trifluoperazine HCL, Nadolol and Benazepril HCTZ, among others.  Notably,
Sandoz and Mylan had formerly agreed, in 2013, to raise price on Benazeprit HCTZ sales:
indeed, in August 2013, Sandoz and Mylan advised CVS and Omnicare of price increases of
300%-400% on the drug.

135.    A similar scenario occurred with respect to Etodolac Expended Release (ER) in
2013 when Defendants Teva, Taro, and Sandoz conspired to raise its price.  In August 2013, for
example, after Teva and Taro coordinated their price increases on the drug to follow those
already put into effect by Sandoz, Omnicare reached out to Taro's Doug Statler to request a
competitive bid for the drug.  Statler responded to Omnicare that it was unable to take on
additional volume at this time.  Later, in August 2015, and after additional conspiratorial price
increases, Taro declined to bid on Etodolac ER tablets at a large supermarket chain where
Defendant Zydus was the incumbent.  Taro voiced concerns internally that Zydus might retaliate
and take share from it on another product, Warfarin Sodium tablets, if it did so.  Specifically, an

analyst at Taro, in an internal email, reasoned that Zydus "could hit us on Warfarin.  Not worth a

fight in the sandbox over 300 annual units for Etodolac."  Taro's focus on "playing nice in the

sandbox" was merely an extension of its prior agreements with other Defendants to allocate

customers of Etodolac ER among them and to, by doing so, increase prices on the drug.

136.    As these examples make clear, the interdependence among generic manufacturers

transcends product markets as these companies make decisions not only based on what impact

their actions will have in a given product market, but also on how those actions will impact other

product markets where the competitors overlap, and any future markets where they might

eventually compete.

137.    In fact, certain Defendants had long-standing agreements with some of their

ostensible competitors to limit competition on any products on which the companies overlapped.

For instance, shortly after Teva's Nisha Patel was hired by Teva in 2013, she reached out to a

Sandoz executive and asked how Sandoz handled price increases.  Patel explained that she had

been specifically hired by Teva to identify products where Teva could increase prices.  The

Sandoz executive told Patel that Sandoz would follow any Teva price increases and that Sandoz

would not poach Teva's customers after Teva increased price.  The Sandoz executive with whom

Patel spoke reiterated his conversation to Sandoz's Armando Kellum, who understood and

approved.

138.    Indeed, generic manufacturers often communicated about, and colluded on,

multiple drugs at any given time. As just one example, in July 2013, Defendant Teva increased

pricing on a list of 21 different products. There was a great deal of internal pressure from

management at Sandoz – including from Sandoz's Armando Kellum – to obtain a copy of the

Teva price increase list.  As a result, a Sandoz employee reached out to his former colleague,

Vice President of Sales at Teva, David Rekenthaler, to obtain a copy of the full Teva price increase list.  Rekenthaler forwarded the list to his own personal email address before then forwarding it to the Sandoz employee's personal email address.  Upon receiving the list, the Sandoz employee read it to his supervisor over the phone.  Notably, the Teva list included a number of products that Defendant Sandoz did not even sell, thus advising Sandoz about drugs that they could now potentially supply (given that they would be higher priced).

139.    It was also not uncommon for generic manufacturers to communicate with each other about products that they did not sell.  This alerted potential competitors to the fact that, if they began supplying those drugs in the future, they would be able to do so at higher price points.  In another example, Defendants Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril in July 2013.  After a lengthy conversation with Teva's Patel in the midst of the price increases, Taro's Ara Aprahamian sent an internal email identifying that Taro was not then selling Enalapril and stating that "[t]here has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)."  And Taro did move fast.  By December 2013, Aprahamian spoke again with Patel, an account manager at Defendant Mylan, and a senior sales and marketing executive at Defendant Wockhardt.  Taro then re-entered the Enalapril market and matched competitor pricing.

140.    In another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of drugs – Mylan's Jim Nesta spoke to Teva's Kevin Green five times. The next day, Green spoke with Sandoz's Kellum.  Kellum then sent an internal email to the Sandoz team stating ". . .  Mylan took a significant price increase on Levothyroxine."  Despite that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

51

141.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to leave markets that they had previously entered. Given that the start-up costs associated with supplying generic drugs are significant, the extent of the entry/exit decisios that have been made by Defendants during the damages period demonstrate that they were impacted by their commitment to the Overarching Conspiracy.  Often these decisions have been made, at least in part, based on who the competitors have been and how strong the relationship has been between the two companies.  As one example, in July 2013, Defendant Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on with Defendant Taro.  This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

142.    This interdependence between the Defendants has been further demonstrated by the countless examples of them sharing sensitive information with competitors as a matter of course. This includes their forwarding of bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

143.    Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy.  For example, in May 2014, a large customer of Taro's received a bid on a generic product from another manufacturer and gave Taro an opportunity to bid to retain the business.  Aleksey Likvornik, a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect."  Elizabeth Guerrero, a senior managed care executive at Taro, responded "explain FS, (Fair Share)?"  Taro's Aprahamian replied:

No emails please. Phone call. ▮▮▮▮let's discuss.

144.     Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after federal and state investigations were well underway – read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

145.     To avoid creating a potentially incriminating paper trail, Sandoz employees routinely admonished colleagues for putting information that was too blatant in emails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

146.     It bears noting that the examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.

**D.     *Defendants Had Ample Opportunity to Conspire***

147.     By colluding, the Defendants recognized that they could collectively increase prices, which ultimately benefitted all of the Defendants and their co-conspirators.

148.     The generic drug market is structured in a way that allows employees directly responsible for sale, marketing or pricing at competing generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.  As Connecticut Attorney General George G. Jepsen commented, "there is a culture of cronyism [in the generic drugs industry] where, whether it's over a game of golf or dinner or drinks, there's just systematic cooperation."[10]  This "culture of cronyism"

---

[10]  Katie Thomas, *20 States Accuse Generic Drug Companies of Price Fixing,* N.Y. Times, Dec. 15, 2016, http://www.nytimes/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.hmtl.

provided Defendants with the opportunity to implement and enforce the Overarching Conspiracy and the various conspiracies related to the Price-Fixed Drugs.

### 1.   Direct Inter-firm Communications on Prices and Business Strategy

149.    As described in more detail below and in the accompanying Appendices, Defendants' understanding of and participation in the Overarching Conspiracy was cemented through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications have occurred with great frequency across the industry, including among Defendants.

150.    For example, from the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke to representatives of significant competitors by phone and/or text on multiple occasions.  Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below.  The following Table (Table 1), which is conservative because it is based on phone and text message records from only some of the Defendants' executives and employees that are responsible for sale, marketing, or pricing, and therefore shows only some of the phone calls and text messages between these employees at ostensibly competing Defendants during that period, sheds some light on the frequency with which they communicated with each other throughout 2013.

**Table 1**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

151.   Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Teva employees Patel, Green, and Rekenthaler speaking with competitors.  Many of those communications involve matters that are addressed in this Complaint.

152.   Similarly, from the period of January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva continued to speak to representatives of significant competitors by phone and/or text on multiple occasions.  Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below.  The following Table (Table 2), which is conservative because it is based on phone and text message records from only some of these executives and salespeople at issue, and therefore shows only some of the phone calls and 1389 text messages between executives and employees at ostensibly competing Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

153.     Of the 941 calls listed in Table 2, 778 of them – or 83% – involved Teva employees Patel and Rekenthaler speaking with competitors (by this time, Green no longer worked at Teva).  Many of those communications involve matters that are addressed in this Complaint.

154.     It was not just Teva personnel that spoke to their competitors.  Personnel directly responsible for sales, marketing and/or pricing from all of the Defendants – including, but not limited to, key conspirators Sandoz, Heritage, Taro, Mylan, Perrigo, and G&W – were routinely speaking to each other, and they did so hundreds or even thousands of times to ensure adherence to the Overarching Conspiracy.  The following graphic shows the interlocking web of communications and relationships between just some of the individuals employed by Teva and certain of its key co-conspirators.  Each line in the graphic below demonstrates that at least one phone call or text message was sent between those individuals (identified by their initials) while they were competitors.  For many of these individuals, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



155.     The specific conspiratorial agreements relating to the Price-Fixed Drugs often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct.  For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants: Teva, Taro, and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; Teva, Mylan, and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR.  These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' Overarching Conspiracy.

2.    **Trade Association and Customer Conferences**

156.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices; rig bids; and engage in market and customer allocation concerning the generic drugs at issue in the Complaint.  Discussions between personnel at various competitors at trade association events that does not involve product pricing, marketing, sales, or other competitively-sensitive information are not conspiratorial.  However, trade association events offer an opportunity for competitive entities to conspire in violation of antitrust law.  And that is just what Defendants did.  Executives and employees of Defendants that were responsible for sales, marketing and/or pricing of generic drugs regularly attended industry meetings and events hosted by these associations to agree upon coordinated price increases, customer allocations, and other forms of market manipulation.  These industry associations include, but are not limited, to the Generic Pharmaceutical Association ("GPhA," now known as the Association for Accessible Medicines, or "AAM"); Healthcare Distribution Management Association ("HDMA," now known as Healthcare Distribution Alliance, or "HDA"); the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"); and the Efficient Collaborative Retail Marketing ("ECRM").  Appendix I identifies various meetings of the referenced trade associations and those individuals that participated in them.  Notably, neither CVS nor its personnel had any inkling that conferences held by these trade associations were used as an opportunity to conspire by Defendants.

157.    GPhA, now known as AAM, bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."

AAM is the result of a 2000 merger between GPhA and two rival trade associations (the National Association of Pharmaceutical Manufacturers and the National Pharmaceutical Alliance). According to AAM's website, its members manufacture "9 out of every 10 prescriptions." GPhA's membership has included, among others, Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, and Zydus.

158.     Throughout the period relevant to Plaintiffs' claims, the GPhA held three conferences each year.  The GPhA Fall Technical Conference was held each year in late October in Bethesda, Maryland.  The GPhA Annual Meeting was held each year in mid-February in Orlando, Florida.  The GPhA CMC Workshop was held each year in early June in Bethesda, Maryland.  Many of the conspiratorial price increases alleged in this Complaint were discussed, at least in part, at the GPhA's three annual meetings (including the numerous social events that were attendant to these meetings, such as golf outings, cocktail parties, and even informal dinners).  In many of the instances alleged above, attendees for each conspirator included individuals with pricing authority over generic pharmaceutical drugs, including the generic drugs at issue in this Complaint.  The State AGs allege that the GPhA meetings and other events "provide generic drug manufacturers . . .  with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."

159.     The HDMA (now known as HDA) is a national trade association representing primary pharmaceutical distributors which link the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics. HDMA held regular conferences where its members, including generic drug manufacturers, met to discuss various issues affecting the pharmaceutical industry. HDMA members, during the relevant time period,

included, among others, Defendants Apotex, Breckenridge, Dr. Reddy's, Lupin, Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, and Zydus. These Defendants used meetings and other events hosted by HDMA as conduits for their conspiracy.

160.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

161.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program . . . . In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy . . . and currently provide healthcare-related contracting to state and local government members located across the United States of America." Total purchases by MMCAP member facilities for all MMCAP programs exceed $1 billion annually.

162.    MMCAP held its National Member Conference in Bloomington, Minnesota on May 12 to 15, 2014. At the 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases." As discussed more fully herein, Defendants used the May 2014 National Member Conference as a conduit for their conspiracy.

60

163.     According to its website, ECRM conducts "Efficient Program Planning Sessions" that are "made up of one on-on-one strategic meetings that connect decision makers in an effort to maximize time, grow incremental sales, and uncover industry trends."  Appendix I lists ECRM meetings attended by Defendants.  Defendants used these ECRM meetings as a conduit for their conspiracy.

164.     As discussed more fully herein, at various conferences and trade shows sponsored by these trade associations and by others, representatives from, at least, some Defendants, as well as other generic drug manufacturers, directly responsible for sales, marketing, and/or pricing of generic drugs discussed their respective businesses and customers and engaged in conspiratorial actions.  These discussions would occur by a subgroup of these Defendant employees that attended those trade association conferences, other industry conferences or trade shows, particularly at social events that were ancillary to the trade conferences or shows, including at lunches, cocktail parties, dinners, and golf outings that usually accompanied these conferences and trade shows.  These Defendant employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.  They did this in order to effectuate and enforce their conspiracies.

165.     These trade shows and trade association conferences have provided generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

166.     For example, in May 2014, a Heritage employee met with competitors to discuss strategies for increasing price on several drugs at a MMCAP meeting.  During that conference, she was able to personally reach and/or confirm agreements with, at least, Defendants Aurobindo

(Fosinopril/HCTZ, Glyburide and Glyburide/Metformin) and Sandoz (Carisoprodol and

Fosinopril/HCTZ), among other competitors.  She advised her supervisor, Heritage employee

and convicted antitrust violator, Jason Malek of her success via email on May 15, 2014:

> Hi Jason.  At the MMCAP meeting yesterday, spoke with some
> other industry reps and found similar like minding on the pricing
> strategies we discussed.  Overall, spoke with Aurobindo, Sandoz,
> Perrigo, Xgen, and Lanett . . . I will try to meet with the Teva rep .
> . . today.

### 3.    Industry Dinners and Private Meetings

167.    In addition to these frequent conferences and trade shows, senior executives, and

sales representatives directly responsible for sales, marketing and/or pricing for generic drugs

have gathered in smaller groups, allowing them to further meet face-to-face with their

competitors and discuss competitively-sensitive information.

168.    Many generic drug manufacturers, including several of the Defendants, are

headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving

them additional opportunities to foster connections and meet and collude. At least 41 different

generic drug manufacturers are concentrated between New York City and Philadelphia,

including, among others, Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark,

Greenstone, Par, Pfizer, Sandoz, Taro, Teva, Wockhardt, and Zydus.

169.    High-level executives of many generic drug manufacturers have gotten together

periodically for what some of them refer to as "industry dinners" to discuss how to continue to

implement and effectuate the Overarching Conspiracy.  For example, in January 2014, at a time

when the prices of a number of generic drugs were reportedly soaring, at least 13 high-ranking

executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug

manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives from Defendants

Actavis, Aurobindo, Breckenridge, and Dr. Reddy's, among many other generic manufacturers, attended this particular dinner.

170.    At these industry dinners, one company has usually been responsible for paying for all of the attendees.  For example, in a group email conversation among the competitors in December 2013, one of the participants – a high-ranking executive for Defendant Dr. Reddy's – joked "[y]ou guys are still buying for Mark and I, right?"  The response from another executive: "Well. . . I didn't think the topic would come up so quickly but . . . we go in alphabetical order by company and [another generic drug manufacturer] picked up the last bill. . . . PS. . . . no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

171.    Other groups of competitor executives and employees directly responsible for sales, marketing and/or pricing gather routinely for golf outings, where they have had the opportunity to spend several days at a time together without interruption and thus have had the opportunity to conspire.  One such annual event was organized by a packaging contractor in Kentucky.  From September 17-19, 2014, for example, high-level executives from Defendants Teva, Apotex, Actavis, Amneal, Par, Zydus, and others were invited to a gathering at a country club in Bowling Green, Kentucky where they would play golf all day and socialize at night.  Teva's David Rekenthaler was in attendance with high-level executives from Defendants Amneal, Apotex, Wockhardt, and other generic manufacturers.  Rekenthaler and a high-level executive from Apotex actually stayed together in the home of the owner of the packaging company that sponsored the event.  At the conclusion of the outing, one of the executives sent an email to the other attendees, stating: "This is a crazy biz but I am grateful to have friends like all of you!!!! Happy and honored to have you all as 'fraternity brothers.'"

172.     Some generic pharmaceutical representatives directly responsible for sales, marketing, and/or pricing also have gotten together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meeting or dinner. During these events, the sales representatives have met with their competitors to discuss competitively sensitive information.

173.     Many "Women in the Industry" dinners at which the continued implementation and enforcement of the Overarching Conspiracy was discussed were organized by a salesperson from Heritage, who resides in the State of Minnesota.  Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area.  However, out-of-town sales representatives were also aware of these dinners and were included when in the area.  For example, in November 2014, Lannett's Tracy Sullivan sent a Heritage employee a text message asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible...."  The Heritage employee responded: "There is an XMas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week -- this was an exception."  Sometimes these dinners were also planned around visits of out-of-town competitors.  As the Heritage employee stated in organizing the dinner: "Sorry if the meeting/dinner invite is a little short notice, but [a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry too -- we can recap all our findings . . .  over a martini or glass of wine! :) Plus the food is super Yummy!"

174.     Several different GNOs were held in 2015, including at the ECRM conference in February (involving Defendants Dr. Reddy's, Greenstone, Teva, UpsherSmith and Zydus, among others) and in May (involving Defendants Dr. Reddy's, Lupin and Teva among others).

175.     These business and social events have occurred with such great frequency. Accordingly, there is an almost constant ability for Defendants to meet in person and discuss their business plans.  These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

176.     Moreover, as discussed more specifically herein, executives at the Defendants had access to and, indeed, used telephone calls, texts, email, and other forms of electronic communications in order to conspire and give effect to the Overarching Conspiracy and each of the conspiracies related to the Price-Fixed Drugs.

**E.     *Evidence That Defendants took Actions against their Self-Interest***

177.     Further evidencing the Overarching Conspiracy and each of the conspiracies to raise price on the Price-Fixed Drugs are actions that the Defendants took that were contrary to their independent self-interest.   As three decades worth of generic drug pricing demonstrates (prior to the consummation of these conspiracies), a firm would likely cut price in order to capture increased market share if its competitors were setting prices above marginal costs. However, once these conspiracies were launched, the Defendants substantially curtailed their attempts to increase their share of generic drugs by lowering price.

178.     Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase the price of its generic products without incurring the loss of a significant volume of sales.  The price increases

on the Price-Fixed Drugs thus would have been contrary to each Defendant's individual self-interest absent these conspiracies.

179.    Time and again, CVS – a large purchaser of drugs – and other generic drug purchasers sought for Defendants to make bids on generic products that they directly purchased. And, time and again, these Defendants refrained from doing so, despite that they were offered a significant opportunity to earn individual profits.  The reason that these Defendants refrained from attempting to make generic drug sales is plain: they realized that doing so would violate the core tenet of Overarching Conspiracy – that is, that each Defendant was to refrain from impinging upon the "fair share" allocated to their co-conspirator generic drug suppliers.

180.    For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER.  Thereafter, there was internal communication within Sandoz regarding whether to pursue CVS as a customer.  Ultimately, although CVS would have provided Sandoz with a significant business opportunity, Sandoz declined to compete for it.  Rather, Sandoz concluded that to do so would disrupt its collusive agreements, particularly with Taro, and erode pricing for Carbamazepine.  As a result, Sandoz declined to bid on the Carbamazepine XR business at CVS and CVS was forced to continue paying for Carbamazepine XR at a supra-competitive price.

**F.    *Federal and State Antitrust Enforcers Have Commenced Legal Proceedings Over the Conspiracy.***

181.    Defendants' conduct regarding generic drugs is under investigation by the DOJ, the State AGs, the United States Congress, and others.

**1.    <u>DOJ Proceedings</u>**

182.    Given the conspiratorial actions of the Defendants, no later than November 3, 2014, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing

practices of generic drugs.  That resulted in the issuance of grand jury subpoenas to several

generic drug manufacturers, including nearly all Defendants and/or their affiliates.

183.    On December 12, 2016, the DOJ filed criminal charges against Jeffrey Glazer, the

former CEO of Heritage, and Jason Malek, the former president of Heritage.  Both Glazer and

Malek, as well as Heritage Pharmaceuticals, have since pled guilty to violations of Section 1 of

the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate

customers for Glyburide and Doxycycline.  The Hon. Barclay Surrick of this Court determined

that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual

of a felony violation of the Sherman Act.  Glazer and Malek also reached settlements with the

State AGs in May 2017, agreeing to pay civil penalties and cooperate with the State AGs'

ongoing investigation.[11]  In addition, Heritage pled guilty in May 2019 as part of a deferred

prosecution agreement including more than $7 million in penalties.[12]

184.    In December 2019, Rising Pharmaceuticals agreed to pay over $3 million in

criminal penalties, restitution, and civil damages.  In a deferred prosecution agreement with the

DOJ, it admitted that it conspired to fix prices and allocate customers for Benazepril HCTZ.[13]

---

[11]  Press Release, State of New Jersey Office of the Attorney General, *States Have Reached Settlements, Cooperation Agreements With Two Former Drug Company Executives* (May 24, 2017), *available at* https://nj.gov/oag/newsreleases17/pr20170524a.html.

[12]  Press Release, U.S. Department of Justice, Pharmaceutical Company Admits to Price Fixing in  Violation of Antitrust Law, Resolves Related False Claims Act Violations (May 31, 2019), *available at* https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false.

[13]  Press Release, U.S. Department of Justice, *Second Pharmaceutical Company Admits to Price Fixing, Resolves, Related False Claims Act Violations* (December 3, 2019), *available at* https://www.justice.gov/opa/pr/second-pharmaceutical-company-admits-price-fixing-resolves-related-false-claims-act.

185.     Furthermore, in February 2020, Hector Armando Kellum, who was responsible for overseeing generic-drug prices and contracts at Sandoz, pleaded guilty to federal conspiracy charges for his role in a scheme to fix prices for a range of products from 2013 to 2015 for a number of products including topical steroid Clobetasol and antifungal Nystatin Triamcinolone cream.[14]  Two weeks later, Sandoz agreed to pay $195 million and admitted under a deferred prosecution agreement with the Department of Justice that it conspired to fix the prices of Clobetasol, Desonide, Nystatin Triamcinolone, Benazepril HCTZ, and Tobramycin.[15]

186.     Also in February 2020, the DOJ charged Ara Aprahamian, a former marketing executive responsible for overseeing generic drug sales at Taro, with crimes related to his role in the price-fixing scheme.  As of the filing of this Complaint, Aprahamian is awaiting trial.  In July 2020, Taro agreed to pay over $205 million to the federal government as part of a deferred prosecution agreement.

187.     In May 2020, Apotex agreed to pay $24.1 million in criminal penalties under a deferred prosecution agreement with the DOJ. Apotex admitted that it conspired with other generic drug companies to fix prices of Pravastatin.[16]

---

[14]  Press Release, U.S. Department of Justice, *Former Generic Pharmaceutical Executive Pleads Guilty for Role in Criminal Antitrust Conspiracy* (February 14, 2020), *available at* https://www.justice.gov/opa/pr/former-generic-pharmaceutical-executive-pleads-guilty-role-criminal-antitrust-conspiracy.

[15]  Press Release, U.S. Department of Justice, *Major Generic Pharmaceutical Company Admits to Antitrust Crimes* (March 2, 2020), *available at* https://www.justice.gov/opa/pr/major-generic-pharmaceutical-company-admits-antitrust-crimes.

[16]  Press Release, U.S. Department of Justice, *Generic Pharmaceutical Company Admits to Fixing Price of Widely Used Cholesterol Medication* (May 7, 2020), *available at* https://www.justice.gov/opa/pr/generic-pharmaceutical-company-admits-fixing-price-widely-used-cholesterol-medication.

188.    In June 2020, the DOJ charged Defendants Teva and Glenmark with conspiring with other generic drug companies to increase and maintain prices of Pravastatin and other generic drugs beginning in or around May 2013 and continuing until at least in or around December 2015.[17]

189.    These various guilty pleas define the minimum parameters of the conspiracy alleged in this Complaint.

190.  Following these plea agreements, the DOJ has obtained and executed search warrants against, at least, Aceto Corporation (which purchased Citron's generic drug business in December 2016), Perrigo, and Mylan in connection with the generic drug price fixing probe. Accordingly, at least one federal judge has necessarily found probable cause that such a conspiracy existed, and that it was probable that evidence of the conspiracy would be found in the offices of Perrigo, Mylan, and Citron.

191.    In addition to the raid of the corporate offices of Perrigo, Mylan, and Aceto, the grand jury empaneled by DOJ as part of its investigation has issued subpoenas to numerous Defendants and/or their employees.  The following Defendants have publicly acknowledged receiving the grand jury subpoenas: Aceto, Actavis, Aurobindo, Citron, Dr. Reddy's, Heritage, Impax, Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus.

192.    Additionally, public sources have reported that, at least, one Defendant or co-conspirator has applied for conditional amnesty under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004.  That a Defendant has applied for leniency is significant,

---

[17]  Press Release, U.S. Department of Justice, *Fifth Pharmaceutical Company Charged In Ongoing Criminal Antitrust Investigation* (June 30, 2020), *available at* https://www.justice.gov/opa/pr/fifth-pharmaceutical-company-charged-ongoing-criminal-antitrust-investigation.

as, to do so, the Defendant had to have admitted to participating in a criminal conspiracy related

to generic drug sales.  This further evidences that the conspiracies alleged herein have occurred.

193.    The DOJ has intervened in *In re Generic Pharmaceuticals Pricing Antitrust*

*Litigation*, MDL 2724, as well as numerous civil antitrust actions alleging price-fixing, bid

rigging, and market and customer allocation of generic pharmaceuticals, stating that these cases

overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action

related to the generic pharmaceutical Propranolol, the DOJ intervened and requested a stay,

stating that "the reason for the request for the stay is the government's ongoing criminal

investigation and overlap of that investigation and this case," and that "the government's

ongoing investigation is much broader than the [Glazer and Malek] informations that were

unsealed."[18]  The DOJ filed a brief with the United States Judicial Panel on Multidistrict

Litigation noting that:  "The complaints in those civil cases – which typically allege that a group

of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix

prices and allocate customers for a particular drug – overlap significantly with aspects of the

ongoing criminal investigation."[19]  In its motion to stay discovery in *In re Generic*

*Pharmaceuticals Pricing Antitrust Litigation*, MDL 2724, the DOJ stated that:  "Evidence

uncovered during the criminal investigation implicates other companies and individuals

(including a significant number of the Defendants here) in collusion with respect to Doxy

Hyclate, Glyburide, and other drugs (including a significant number of the drugs at issue

---

[18]  *See* Transcript of Hearing, *In re Propranolol Antitrust Litig.*, No. 16-cv-9901 (S.D.N.Y. Feb. 21, 2017), ECF No. 112, at 10–11.

[19]  *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re Generic Digoxin and Doxycycline Antitrust Litig.*, MDL No. 2724 (J.P.M.L. Mar. 10, 2017), ECF No.  284, at 2.

here).”[20]  After discovery was stayed pending resolution of various cross-motions, DOJ sought to

extend the stay of discovery.[21]

194.    Some of the companies that have received subpoenas relative to the generic drug

price-fixing probe have confirmed that the inquiry extends to other drugs.  For example, Mayne

disclosed that the criminal investigation into its conduct “is focused on [Doxy DR] and

potassium chloride powders,” and Impax disclosed that the DOJ subpoena focused on specific

drugs including Digoxin and Lidocaine/Prilocaine.

195.    The DOJ’s Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every
> year and rely on generic pharmaceuticals as a more affordable
> alternative to brand name medicines.   The Division’s investigation
> into the generics market, however, has revealed that some
> executives have sought to collude on prices and enrich themselves
> at the expense of American consumers.[22]

196.    In a May 2019 press release announcing Heritage’s admissions of guilt, the DOJ

reported that Heritage’s “cooperation has allowed the United States to advance its investigation

into criminal antitrust conspiracies among other manufacturers of generic pharmaceuticals.”[23]

---

[20]  *See* United States’ Motion to Stay Discovery*, In re Generic Pharm. Pricing Antitrust Litig.*,
No. 16-md-2724 (E.D. Pa. May 1, 2017), ECF No. 279.

[21]  *See In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-md-2724 (E.D. Pa.), ECF Nos. 516-
1,  534, 560.

[22]  U.S. Dep’t of Justice, Division Update Spring 2017:  *Division Secures Individual and
Corporate Guilty Pleas for Collusion Affecting Millions of American Consumers* (Mar. 28,
2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-
2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-
products.

[23]  Press Release, U.S. Department of Justice, *Pharmaceutical Company Admits to Price Fixing in
Violation of Antitrust Law, Resolves Related False Claims Act Violations* (May 31, 2019),
*available at*  https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-
violation-antitrust-law-  resolves-related-false.

2.      **State Attorneys General proceedings**

197.    In addition to the DOJ criminal enforcement action, 48 State AGs, led by the

Connecticut Attorney General, have also filed civil enforcement actions in the U.S. District

Court for the Eastern District of Pennsylvania[24] based on their investigation to date into generic

drug pricing.  To date, the State AGs have identified over twenty generic drug manufacturers as

co-conspirators allegedly acting to fix prices of more than 130 different generic drugs, as part of

an Overarching Conspiracy.[25]

198.    In essence, the State AGs allege that markets for more than 130 generic drugs

(along with many other drugs not included in their Complaints) were cartelized based on an

agreement or understanding between or among Defendants and their co-conspirators to refrain

from competing with each other on the pricing and sale of the generic drugs in the United States.

This agreement or understanding that the Defendants and their co-conspirators adhered to

provides that each generic manufacturer "is entitled to its [predetermined share] of the market,

whether that market is a particular drug, or a number of generic drugs.  [The predetermined

share] is an approximation of how much market share each competitor is entitled to, based on the

number of competitors in the market, with a potential adjustment based on the timing of entry. . .

. The shared objective, however, is to attain a state of equilibrium, where no competitors are

---

[24]  To date, Attorneys General of 48 states, Puerto Rico, and the District of Columbia, and the Attorneys General of other U.S. territories have joined the State AG litigation.

[25]  The Defendants identified by the State AGs include Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro,  Teva, Upshur-Smith, Wockhardt, and Zydus.

incentivized to compete for additional market share by eroding price."[26]  In other words, generic

drug manufacturers followed an express agreement to apply a negotiated formula that allocated

the market share for the manufacturers of numerous generic drugs.

199.    The State AGs establish that this formula was developed and agreed to as the

result of "an almost constant ability for Defendants to meet in person and discuss their business

plans," including at the forums -- such as trade association meetings and industry events -- and

through the electronic media described above.[27]

200.    The State AGs further establish that, in furtherance of the conspiracy, Defendants

would frequently rig bids by increasing pricing to existing customers in order to allow another

conspirator to win the business of that customer and obtain the market share to which it was

entitled by the conspiracy's formula.  They also allege that this process of purposefully

abandoning existing customers would occur frequently when a new conspirator entered the

market for a generic drug.[28]

201.    Finally, the State AGs allege that, by adhering to the common understanding

regarding the market share to which each conspirator was entitled, the Defendants also facilitated

substantial price increases.[29]

202.    These allegations – and numerous others – from the State AGs' investigation and

litigation are supported by direct evidence from, at least, six cooperating witnesses.  The

---

[26]  State AG Teva Complaint (2:19-cv-02407-CMR ECF 106 at ¶¶ 116, 131); *see also* State AG
Heritage Complaint (2:17-cv-03768-CMR ECF 15 at ¶¶ 90, 97); State AG Sandoz Complaint
(2:20-cv-03539-CMR ECF 1 at ¶¶ 125, 135).

[27]  State AG Teva Complaint ¶¶ 104-105, 118.

[28]  *Id.* ¶ 134.

[29]  *Id.* ¶ 136.

expected testimony from these cooperating witnesses will directly support and corroborate the

allegations throughout this Complaint.  According to the State AG Complaints, some of these

cooperating witnesses include:

>        (a)      A former pricing executive at Defendant Sandoz during the time period
>        relevant to this Complaint;
>
>        (b)      A former sales and marketing executive at Rising Pharmaceuticals, Inc.
>        and Defendant Sandoz during the time period relevant to this Complaint;
>
>        (c)      Two senior sales executives at Defendant Sandoz during the time period
>        relevant to this Complaint;
>
>        (e)      A former senior executive at Defendant Glenmark during the time period
>        relevant to this Complaint; and
>
>        (f)      Jason Malek ("Malek"), the former Vice President of Commercial
>        Operations at Defendant Heritage, who pled guilty to his role in the price fixing of
>        Glyburide and Doxycycline.

### 3.      Relevant Congressional Proceedings

203.   In addition to the investigations by the DOJ and the State AGs, Congress has

raised concerns about the alarming price spikes for numerous generic pharmaceuticals.

204.   In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings

requested information from manufacturers of ten drugs that had experienced extraordinary price

increases.[30]  In November 2014, Senator Sanders conducted a hearing entitled "Why Are Some

Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). Various witnesses discussed the

price hikes for generic drugs, but none of the industry executives that were invited to testify

appeared.[31]

---

[30]  Senator Sanders, Press Release, Congress Investigating Why Generic Drug Prices Are
Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-
releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[31]  Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-
some-generic-drugs-skyrocketing-in-priced.

205.    Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[32]

206.    In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare:  Part D Generic Drug Prices Declined Overall, But Some Had Extraordinary Price Increases."[33]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[34]  And this was the case for most generics.  But the investigation identified numerous drugs that experienced "extraordinary" increases, defined as an increase of more than 100%.

### G.    *Defendants' Conspiracy was Effective And is Still Ongoing*

207.    As set forth more fully herein, as a proximate result of this conspiracy, Defendants and their co-conspirators charged CVS and others in the United States supra-competitive prices for each of the Price-Fixed Drugs.

208.    To date, the prices for many, if not most, of the Price-Fixed Drugs remain at artificially inflated, supra-competitive levels.

---

[32]  HHS OIG, Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[33]  GAO Report to Congressional Requesters, Generic Drugs Under Medicare (Aug. 12, 2016) ("GAO Report"), *available at* https://www.gao.gov/products/GAO-16-706.

[34]  GAO Report, at 23–25.

209.   The conspiracies alleged herein remain either in force or effect (or both) and Defendants continue to charge CVS supra-competitive prices for the Price-Fixed Drugs.  Other than those Defendants that have admitted their guilt in criminal proceedings, none of the Defendants have withdrawn from the conspiracies alleged herein.

## ANTITRUST INJURY

210.   CVS has sustained antitrust injury.  Defendants have imposed supra-competitive prices on the Price-Fixed Drugs that CVS and its assignors have paid directly to them.  Those prices have been substantially higher than the prices that CVS or its assignors would have paid for the Price-Fixed Drugs due to Defendants' collusive conduct.

211.   CVS suffered "extraordinary" price increases (as the term has been used by the GAO) on hundreds of Price-Fixed Drugs, as a result of the conspiracies detailed herein.

212.   Defendants have imposed these supra-competitive prices on Price-Fixed Drugs purchased by CVS by increasing price and/or reducing competition in the sale of the Price-Fixed Drugs.

213.   CVS has sustained substantial damages in the form of overcharges on the Price-Fixed Drugs due to Defendants' conspiratorial actions.  While the full amount, forms and components of such damages will be determined after discovery and upon proof at trial, CVS currently estimates that its total damages from the Overarching Conspiracy is likely to exceed $2.5 billion, prior to trebling.

214.   Prices for the Generic Drugs have been and continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## TOLLING OF THE STATUTE OF LIMITATIONS/FRAUDULENT CONCEALMENT

## THE STATUTES OF LIMITATIONS DO NOT BAR CVS'S CLAIMS

215.   The statute of limitations as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Complaint were tolled for several reasons.

**I.     TOLLING DUE TO THE FILING OF APPLICABLE CLASS ACTION COMPLAINTS (*AMERICAN PIPE TOLLING*)**

216.   The pendency of one or more Class Action Complaints, and any Amendments thereto, against Defendants and their co-conspirators regarding particular Price-Fixed Drugs tolled the running of the statute of limitations on CVS's claims concerning them.

217.   The pendency of one or more Class Action Complaints, and any Amendments thereto, against Defendants and their co-conspirators concerning the Overarching Conspiracy tolled the running of the statute of limitations on CVS's claims concerning it.

**II.    GOVERNMENT CRIMINAL INVESTIGATIONS—15 U.S.C. § 16(I).**

218.   The statute of limitations on CVS's claims was independently tolled as a result of the pendency of the criminal investigations conducted by and criminal proceedings commenced by the DOJ referenced above.

219.   For example, the DOJ charged Defendant Teva, in a superseding indictment filed in August 2020, with entering into a broad antitrust conspiracy to inflate generic drug prices with defendants Taro and Sandoz.  In particular, the DOJ charged that these companies "knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States."

220.   As described above, other criminal proceedings have been commenced by the DOJ regarding these conspiracies against both individuals and entities.  These proceedings toll

the running of the statute of limitations on CVS's claims for one year following each of the dates set forth above by operation of 15 U.S.C. § 16(i).

## III.    FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS

221.    Numerous overt acts in furtherance of the Overarching Conspiracy alleged in this Complaint (and in furtherance of the specific conspiracies to inflate the prices of the Price-Fixed Drugs) were engaged in for the purpose of concealing the conspiracy and preventing CVS from learning about the conspiracy's existence.  More than four years before CVS filed this Complaint, Defendants and their co-conspirators fraudulently concealed the existence of CVS's antitrust claims so that CVS, acting as a reasonable person, did not know of the existence of its claims at the time.

### A.    *Defendants Took Active Measures to Conceal the Overarching Conspiracy*

222.    Through misleading, deceptive, false and fraudulent statements, Defendants effectively concealed the Overarching Conspiracy, thereby causing economic harm to CVS. Defendants' misrepresentations regarding their price changes were intended to lull CVS into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts.

223.    Even after news of the DOJ's investigation into the pricing of generic pharmaceuticals became public, Defendants continued to make misleading, deceptive, false, and fraudulent statements regarding the existence of the Overarching Conspiracy.

224.    CVS had no knowledge of Defendants' conspiracy alleged herein or of facts sufficient to place it on inquiry notice of the claims set forth against Defendants until after four years prior to the filing of this Complaint.

225.    During the relevant period, Defendants made a series of misleading, deceptive,

false and fraudulent statements and omissions of material fact regarding the competitive nature

of the generic drug market, the reasons for the Generic Drugs' price increases, and the reasons

for Defendants' increasing revenue.

226.    For example, on October 29, 2013, former Allergan executive and CEO of

Defendant Teva, Siggy Olafsson, stated during an investor call (emphasis supplied):

> With regard to the generic pricing outlook at a high level, what has
> happened probably over the last two years is it has been more
> common that obviously there is a price erosion in the market due to
> the consolidation. *But there [are] opportunities to take pricing
> increases; and that is what has changed since maybe five years
> ago when there wasn't an opportunity.  These pricing increases
> have been in products where there has been manufacturing
> problems or stock- out situation.*
>
> *So I think that has been a fact in the US generic market, that there
> is an opportunity to take price increases*.

227.    Defendants also went to great lengths to discredit the DOJ's criminal

investigation into generic drug pricing.  For example, on August 6, 2015, Allergan's CEO Brent

Saunders discussed the grand jury subpoena that his company had received in an interview with

Jim Cramer on CNBC's Mad Money.  In that interview, Saunders falsely dismissed the

possibility of collusion causing the increase in the pricing of the Generic Drugs, claiming that the

price increases were the natural consequence of competitive markets:

> *[T]he DOJ investigation really is a red herring.* [T]he government
> in the U.S. has gotten used to drug prices in generics going one way
> – down. *But it's a commodity business, and so they go up and down
> depending on supply and demand*. This was a subpoena about three
> products where *prices went up because of supply and demand* and,
> to be fair, it will play itself out.

228.    Defendants' efforts to discredit the DOJ's criminal investigation and the other

government actions continued into more recent years.  In an interview with journalists in August

2019, CEO Kåre Schultz of Defendant Teva falsely claimed that:

> Based on everything we have seen, *we have not found any evidence* whatsoever of any organized price-fixing on our behalf, so we *deny the allegations.*

In a subsequent interview with Barron's, published on November 7, 2019, Schultz further prevaricated, stating:

> *We have not found any evidence* in all those [millions of] documents that we in any way participated in organized collusion or price fixing.

229.    Defendant Mylan also released similarly false and misleading statements concerning the allegations contained in the various pleadings filed by the Attorneys General.  For example, on August 14, 2019 Mylan stated:

> With assistance from outside counsel *we thoroughly investigated allegations made against our company* and employees in the civil complaint filed by various state attorneys general, including the most recent allegation relating to obstruction. *We have not found any evidence to corroborate the allegations*.

230.    Most recently, on August 25, 2020, in response to the filing of a criminal indictment against Teva and Glenmark, Teva issued a press release, which definitively and wrongly denied any involvement in any conspiracy to fix prices regarding the Generic Drugs:

> Teva is deeply disappointed that the government has chosen to proceed with this prosecution. *The Company has been investigating this matter for over four years and has concluded that Teva did not participate in price fixing.* Based on our internal review, Teva firmly rejects the allegations

231.    Defendants repeatedly made false or pretextual statements to CVS regarding the reasons why Defendants chose not to deal with it, one of the largest buyers of generic pharmaceuticals.  For example:

> a.   In May 2013, CVS solicited a bid from Defendant Sandoz on Desonide. Sandoz declined to bid for the CVS business on the drug, citing active pharmaceutical ingredients ("API") constraints.  In reality, Sandoz refused

80

to provide CVS with a bid to supply Desonide because it had previously agreed to allocate the Desonide business with its competitors, among others, Taro, Actavis, Fougera and Perrigo and, as a result, had already agreed not to supply Desonide to CVS.

b.  In August 2013, Omnicare reached out to both Defendant Apotex and Defendant Zydus seeking a bid on Pravastatin.  Both declined to bid, citing API constraints.  In reality, Apotex and Zydus refused to provide Omnicare with bids to Pravastatin because they had previously agreed to allocate the Pravastatin business with their competitors, among others, Teva and Glenmark and, as a result, had already agreed not to supply Pravastatin to Omnicare.

c.  In August 2013, Omnicare solicited a bid from Defendant Taro on Etodolac. Taro said it was unable to provide an offer on Etodolac because it could not take on additional volume at that time.  In reality, Taro chose not to provide an Etodolac offer to Omnicare because it had previously agreed to allocate the Etodolac business with its competitors, among others, Teva and Zydus and, as a result, had already agreed not to supply Etodolac to Omnicare.

232.   Defendants also misled other customers as to its real reasons for declining to bid for new business.  For example, in April 2012, when Greenstone sent out price increase notices for a number of products, including Latanoprost Drops, Walgreens approached Sandoz looking for a lower price on Latanoprost Drops.  Sandoz's Armando Kellum instructed Steven Greenstein, one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid,

instructing Greenstein to say that Sandoz had a supply issue, even though Sandoz had plenty of supply.

233.    Indeed, when G&W's Erika Vogel-Baylor was asked by a G&W sales executive whether she was straightforward with customers regarding the true reason why G&W declined to bid to maintain market balance, Vogel-Baylor's response indicated that she would knowingly mislead customers regarding G&W's true reasons for declining to bid on business.

234.    Likewise, Perrigo misled customers as to its reasons for declining to bid on new business.  For example, on March 21, 2014, Plaintiff Omnicare reached out to Perrigo asking for a bid on CBD ointment.  Plaintiff Omnicare was a customer allocated to Sandoz.  At John Wesolowski's direction, Perrigo told Omnicare that it was not taking on any more customers even though Perrigo was actively sending offers to other potential customers at that time.

235.    Moreover, as stated above, Defendants took active steps to conceal the evidence of their illegal actions, taking steps to admonish their co-conspirators from memorializing their conspiratorial conversations in writing.

236.    Sandoz's Kellum also routinely admonished his colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.  Indeed, handwritten notes from an internal Sandoz business review presentation from May 2017 read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

237.    Heritage's Glazer often reminded Heritage's Malek not to put any evidence of his illegal conduct into writing.  In a text message dated June 26, 2014, Glazer sternly warned Malek about his use of email: "No emails about products, price and competitors."  That same day, in an email to the entire sales team at Heritage, Glazer made the point as clearly as possible: "We

don't talk about pricing dynamics and competition on emails. If you have questions – you can call [Malek] or me directly and then punch yourself in the fact."

238.    Notably, Defendants did not work alone in their efforts to conceal their illegal activity.  For example, in June 2014, shortly after a text message exchange between Citron's Kaitlin Alexander and Heritage's Anne Sather where the two competitors discussed and agreed to raise the price of Glyburide, Citron's Karen Strelau called Heritage's Daniel Lukasiewicz, informing him that she had been "looped" in on Heritage's plan.  According to Sather's notes, Strelau told Lukasiewicz that Heritage employees should not communicate with Citron through email, but should instead call if they had information to convey.

239.    Moreover, Defendants and their employees were well aware that what they were doing was illegal.  They received antitrust training and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws.

240.    Through their lying, deceptive, and false statements, Defendants effectively concealed the Overarching Conspiracy, thereby causing economic harm to CVS.

### DEFENDANTS ENGAGED IN OBSTRUCTION OF JUSTICE

241.    Many of the individual participants, and other employees of the various Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

242.    For example, Teva's Nisha Patel produced text messages in response to the State AGs' subpoena going back as far as early 2014.  Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with co-conspirators Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler, and Sullivan, and many other text messages with employees

of Dr. Reddy's, Glenmark (including CW-5), Greenstone (including Hatosy), Par, Sandoz, Upsher-Smith, and Zydus.

243.    Patel deleted these text messages after a conversation with co-conspirator and fellow employee of Defendant Teva, David Rekenthaler, in early 2015 when Rekenthaler warned Patel to be careful about communicating with competitors.  Rekenthaler was aware of the government investigations that had been commenced and told Patel that the government was showing up on people's doorsteps.  Sometime after that, Patel deleted her text messages with competitors.

244.    Defendant Apotex also destroyed an entire custodial file for one of its key employees (a senior sales executive) after the State AGs requested it through an investigatory subpoena in July 2017.  This sales executive was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the "quality competitor" rankings. After the State AGs' subpoena was issued, Defendant Apotex destroyed this sales executive's custodial file—and did not inform the States that it had done so for over a year.

245.    None of the email accounts maintained by Heritage has had any document retention policy associated with them. Heritage executives were aware of this: they utilized the lack of a company retention policy to routinely destroy emails that memorialized their illegal conduct.  Moreover, Heritage executives were aware that, in order to permanently destroy an email, the email had to be deleted from more than just the recipient's in box. For example, on June 27, 2012, Heritage CEO Glazer sent an email to Malek titled "Email," instructing: "Clean your sent file out as well."

246.    As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection and spoliate evidence. On June 2,

84

2015, after it had become public that Connecticut and the DOJ were investigating the industry, Malek sent Sather a text message stating: "Just got your email on meprobamate. Let's avoid emailing about other manufacturers and having discussions with them.  Can be misconstrued based on what we are hearing elsewhere. . . ."  Heritage did not produce the referenced email in response to Connecticut's subpoena, even though the subpoena sought all such documents.  The referenced email has, along with other relevant documents, been deleted by Heritage.  Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

247.    Many of the Defendants have also been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response.

248.    For example, when the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized), even though Rekenthaler was no longer employed at Teva and was by that point the Vice-President of Sales at Defendant Apotex.  Rekenthaler then immediately called co-conspirator Maureen Cavanaugh and another senior Teva executive. Rekenthaler spoke several times to Cavanaugh before calling his own attorney and speaking twice.  Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

249.    Other Defendants took similar action in response to events in the State AGs' investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the State AGs were engaging in substantive discussions with their counsel. As just one example, on July 17, 2018, the State AGs sent a subpoena to co-conspirator Jim Grauso, through his counsel.  That same day, Grauso spoke to Ara Aprahamian for more than 12 minutes. The

State AGs then set up a conference call with Grauso's counsel for July 25, 2018.  The day before

that call—July 24, 2018—Aprahamian spoke to his lawyer, and then shortly thereafter called

Grauso. The next day, shortly after a conversation between the State AGs and counsel for

Grauso, Aprahamian and Grauso spoke again, this time for nearly seven minutes.

*      *      *      *      *

250.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing.

Accordingly, a reasonable person under the circumstances would not have been alerted to

investigate the legitimacy of Defendants' prices before these disclosures.  Defendants spoke and

met in secret to conceal the Overarching Conspiracy, often under the pretext of trade association

and industry activities as set forth above and took steps (beyond those alleged above) to ensure

that communications relating to the Overarching Conspiracy were not recording in writing.  In

some cases, as explained above, price increases were staggered to conceal the existence of the

Overarching Conspiracy.  Also, as alleged above, Defendants engaged in bid coordination and

rigging, which were intended to, and did, give the false impression of competition among

Defendants.

251.    Because of the deceptive practices and techniques of secrecy employed by

Defendants and their co-conspirators to conceal their illicit conduct, CVS could not have

discovered the details of the conspiracy alleged herein at an earlier date by the exercise of

reasonable diligence.  CVS acted with due diligence at all relevant times by, among other things,

monitoring availability prices for the Price-Fixed Drugs and seeking to obtain the most favorable

prices possible, efforts that were hindered by Defendants' concealment and refusals to deal with

Plaintiffs.  To that end, CVS frequently submitted requests for competitive bids on Price-Fixed

Drugs to Defendants but, unbeknownst to CVS, Defendants shared these requests and took steps to coordinate their responses.

252.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by CVS as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, CVS was unaware of Defendants' unlawful conduct and did not know that it was paying supra-competitive prices throughout the United States during the Relevant Period.

253.    For these reasons, CVS's claims are timely under all of the federal, state, and common laws identified herein.

## CONTINUING VIOLATIONS

254.    This Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Defendants' unlawful conduct has inflicted continuing and accumulating harm with the applicable statutes of limitations.

255.    Thus, all applicable statutes of limitations are also tolled because Defendants' anticompetitive activities have not ceased and still continue to this day.  For example, Defendants continue to charge prices for Price-Fixed Drugs that are significantly above the competitive price levels established prior to the Overarching Conspiracy.  Every sale of a Price-Fixed Drug made by Defendants at supra-competitive prices is an overt act taken in furtherance of the Overarching Conspiracy.

256.    Moreover, virtually none of the Defendants have withdrawn from the conspiracy. And all of them have continued to profit from the ongoing anticompetitive effects that the conspiracy has caused.

257.     Thus, any causes of action are not complete and do not accrue until Defendants'
anticompetitive acts have ceased.

## CLAIM FOR RELIEF—SHERMAN ACT § 1 (OVERARCHING CONSPIRACY)

258.     CVS repeats and realleges each and every allegation of this Complaint (including
those made in the Appendices attached hereto) as if fully set forth herein.

259.     Defendants, along with their co-conspirators, have entered into continuing illegal
contracts, combinations or conspiracies -- that are subsumed within an Overarching Conspiracy –
to restrain trade, the purpose and effect of which has been to eliminate competition in the sale of
generic drugs and to raise the price of generic drugs to supra-competitive levels.

260.     This Overarching Conspiracy is illegal *per se* under Section 1 of the Sherman Act,
15 U.S.C. § 1.  The agreements implementing and effectuating this Overarching Conspiracy are
facially anticompetitive.

261.     The contracts, combinations, agreements, or conspiracies that are subsumed
within Defendants' Overarching Conspiracy have caused substantial anticompetitive effects,
including, but not limited to, a reduction in competition among suppliers of generic drugs and
substantial increases of generic drug prices to direct purchasers, such as CVS.

262.   The agreements implementing and effectuating this Conspiracy substantially
affected and still affect interstate commerce.

263.   There are no justifications for Defendants' conspiratorial actions.

264.   As a direct and proximate result of these violations of Section 1 of the Sherman
Act, 15 U.S.C. § 1, CVS has been injured in its business or property because it has had to
purchase numerous generic drugs, including those identified herein, at supra-competitive prices,
and Defendants have enjoyed ill-gotten gains from the sales of these generic drugs.  CVS has

suffered and will continue to suffer antitrust injury as a direct and proximate result of the Defendants' conspiratorial actions.

265.    As a direct and proximate result of these violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, CVS has been injured in its business and property in an amount not presently known.

266.    These agreements were part of the Overarching Conspiracy among the Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and maintain the prices for generic drugs, including those identified herein. As participants in the Overarching Conspiracy, all the Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## CLAIM FOR RELIEF—SHERMAN ACT § 1 (EACH PRICE-FIXED DRUG)

267.    CVS repeats and realleges each and every allegation of this Complaint (including those made in the Appendices attached hereto) as if fully set forth herein.

268.    Defendants, along with their co-conspirators, have entered into continuing illegal contracts, combinations, or conspiracies in restraint of trade, the purpose and effect of which has been to eliminate competition in the sale of each Price-Fixed Drug and to raise the price of each Price-Fixed Drug to supra-competitive levels.

269.    These contracts, combinations, agreements, or conspiracies are illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

270.    These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects, including, but not limited to, a reduction in competition amongst suppliers of generic drugs and substantial increases of generic drug prices to direct purchasers, such as CVS.

271.    There are no justifications for Defendants' conspiratorial actions.

272.    The agreements implementing and effectuating this Conspiracy substantially affected and still affect interstate commerce.

273.    As a direct and proximate result of these violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, CVS has been injured in its business or property because it has had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendants have enjoyed ill-gotten gains from the sales of these generic drugs.  CVS has suffered and will continue to suffer antitrust injury as a direct result of Defendants' conspiratorial actions.

274.    As a direct and proximate result of these violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, CVS has been injured in its business and property in an amount not presently known.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, CVS respectfully demands:

**A.**    that the Court declare, adjudge, and decree that each Defendant has committed the violations of law alleged herein;

**B.**    that the Court award damages sustained by CVS because of Defendants' misconduct, in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees, and costs of suit;

C.    that the Court enjoin Defendants from continuing to engage in the Overarching

Conspiracy and all conspiracies to allocate sales and fix, maintain or stabilize

prices for the Price-Fixed Drugs; and

D.    that the Court grant such other and further relief as it may deem just and proper.

## JURY DEMAND

CVS hereby demands trial by jury of all issues properly triable thereby.

Dated: December 15, 2020

Douglas F. Johnson
PA ID #40036
EARP COHN P.C.
123 South Broad Street, Suite 1030
Philadelphia, PA 19109
(215) 963-9520

Ethan E. Litwin
Matthew L. Cantor
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700

Allison F. Sheedy
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, N.W.,
Suite 1300N
Washington, D.C. 20004
(202) 204-3500

*Counsel for Plaintiff CVS Pharmacy, Inc.*

91